No. 98,740

In the Matter of the Adoption of A.A.T., a Minor Child.

(196 P.3d 1180)

Opinion filed December 12, 2008.

*William A. Vickery*, of Law Office of John F. Reals, of Wichita, argued the cause, and *Nancy Ogle*, of Ogle Law Office, L.L.C., of Wichita, was with him on the briefs for appellant natural father.

*Rachael K. Pirner*, of Triplett, Woolf & Garretson, LLC, of Wichita, argued the cause, and *Paula D. Langworthy*, of the same firm, was with her on the brief for appellees adoptive parents.

*Martin W. Bauer*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, was on the brief for *amicus curiae* American Academy of Adoption Attorneys.

The opinion of the court was delivered by

LUCKERT, J.: In this appeal, a natural father seeks to set aside the adoption of his newborn child. Although he did nothing during the pregnancy to assume parenting responsibilities and preserve his liberty interest in fatherhood, he asserts this should be excused and a liberty interest should be recognized because the natural mother induced his inaction by lying to him about the pregnancy and the birth. Then, she lied to the district court regarding the father's identity, preventing him from receiving notice and an opportunity to be heard in the adoption. Consequently, according to his argument, the adoption is void.

The district court rejected these arguments, and we affirm that ruling. A liberty interest, which results in the right to notice, is created by a developed familial relationship, not just biology. In a newborn adoption situation, a father must demonstrate a full commitment to parenting during the pregnancy, and in this case the natural father's opportunity to parent did not develop into a full parenting relationship that warrants constitutional protection. Even though the father may be blameless in this failure that was induced by the natural mother's fraud, his belated attempt to assert a parental interest, beginning 6 months after the adoption was final,

cannot overcome the fully matured interests of the State and the adoptive family in the permanency and stability of the adoption.

*Factual Background and Pretrial Procedural History*

This case began in New York, where the natural mother, N.T., became sexually involved with the natural father, M.P. N.T. informed M.P. in mid-October 2003 that she was pregnant with his child. Then, just before Thanksgiving, N.T. left New York to visit her parents in Wichita. She later decided to stay in Kansas.

After leaving New York, N.T. refused to give M.P. the address where she was living, but the couple remained in telephone contact. M.P.'s cell phone records show that as early as November 25, 2003, he was making calls to Wichita.

In a phone call on January 22, 2004, N.T. falsely informed M.P. that she had undergone an abortion. She later testified that she did so because she knew M.P. would not consent to an adoption. After the conversation in which N.T. lied about the abortion, M.P. continued to question N.T. about the pregnancy, doubting her veracity. In May 2004, M.P.'s expression of skepticism led to an argument with N.T. that temporarily stopped their telephone contact.

After a period of time but before the child was born, M.P. and N.T. began talking again and continued to do so throughout the remainder of the pregnancy and following their child's birth on June 24, 2004, in Wichita. During this time, M.P. continued to express his doubts about N.T.'s truthfulness, making statements like, "Why do I have a feeling you're lying to me?" and "I know I have a child, I can feel it." M.P. told a friend that he thought he had a daughter, and he bought a pair of earrings before Christmas 2004, apparently as a gift for the child he imagined he might have.

M.P. was not the only one deceived by N.T. N.T. told her mother, other family members, and friends that the baby died at delivery. She also deceived the adoption agency regarding the identity of the father, claiming not to know his last name and to have only vague information about where he lived.

The day after the birth, N.T. directed that A.A.T. be given to the adoptive parents, who took the baby home from the hospital. The adoptive parents filed their petition for adoption and for ter-

mination of the parental rights of the father on July 1, 2004, when A.A.T. was 1 week old. As part of this proceeding, N.T. again lied. She executed an affidavit that gave a false surname for the newborn child's putative father. She also falsely stated that the father was "not willing to be of assistance to [her] during the pregnancy and with regard to these proceedings" and that she had no personal knowledge of his background information.

A guardian ad litem (GAL) was appointed to represent the putative father. After interviewing N.T., the GAL filed an affidavit with the court, passing on incorrect information supplied by N.T., including a false surname for the putative father and representations that N.T. had not contacted the father since her second month of pregnancy and that he was aware of her intent to place their child for adoption. In addition, N.T. failed to pass along information such as M.P.'s address.

Although there is some evidence that at the hospital N.T. told a representative of the adoption agency that she had just spoken to A.A.T.'s father, and that the agency did not follow up on this lead, an agency representative later testified that she had no recollection of N.T. making a statement to this effect. The representative also said she would have notified the GAL if she had been told about a recent conversation between N.T. and the child's father.

In the absence of correct information about M.P. and his willingness or unwillingness to relinquish his parental rights under K.S.A. 59-2124, a notice including the inaccurate name of the putative father and "To Whom It May Concern" was published in the New York Post on July 30, 2004, and August 6, 2004. See K.S.A. 59-2136(e), (f) (if father identified to satisfaction of court, or more than one man identified as possible father, each shall be given notice of adoption proceedings by personal service, certified return receipt requested, or "in any other manner court directs"). The item in the New York Post, which circulates to every county in New York, also contained A.A.T.'s last name and stated that Kansas was the location of the proceeding. Nothing was done to provide actual notice of the adoption to M.P.

No father appeared before the court. The natural father's parental rights thus were terminated and the adoption decree was

finalized on August 24, 2004. See K.S.A. 59-2136(g) (if no person appears claiming to be father and claiming custodial rights, court shall enter order terminating father's parental rights).

In late December 2004, when A.A.T. was 6 months old, N.T. finally told M.P. the truth. Within 6 weeks, M.P. had retained Kansas counsel and had begun this action to set aside the adoption pursuant to K.S.A. 59-2213 and K.S.A. 60-260(b). M.P., possibly with the assistance of his lawyer, had been able to obtain the names, residential address, and church affiliation of the adoptive parents.

M.P. requested DNA testing to confirm paternity, a status conference to set a discovery schedule, and "orders to proceed with the case." The adoptive parents moved to dismiss. At a March 23, 2005, hearing, the district court ordered the matter to proceed and considered whether genetic testing should be performed to determine if M.P. was the father and thus had standing to challenge the adoption. The attorneys present agreed that the adoptive parents were entitled to a *Ross* hearing to determine whether such testing was in A.A.T.'s best interests. See *In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989). A GAL was appointed for A.A.T.

Before the *Ross* hearing could be held, M.P. advocated for a different approach, submitting a memorandum arguing that the *Ross* hearing was unnecessary. The district court was persuaded, and the adoptive parents took an interlocutory appeal to our Court of Appeals. The Court of Appeals affirmed the district court in *In re Adoption of A.A.T.*, No. 95,914, unpublished opinion filed December 22, 2006.

Upon remand, DNA tests were performed. The results confirmed M.P.'s paternity of A.A.T. M.P. then sought a trial on the issue of whether the adoption should be set aside and requested visitation with A.A.T. pending resolution of the issue. The record on appeal is silent on the district court's decision on the visitation question. The information before us indicates that A.A.T. has been living exclusively with the adoptive parents since leaving the hospital with them as a newborn. Recently, M.P. filed a motion with this court renewing his request to have visitation with A.A.T.

*District Court's Ruling on the Adoption*

After trial, the district court refused to set aside the adoption

decree. The court found, *inter alia*, that the adoption agency and adoptive parents had acted in good faith in the adoption proceeding. The court also found that M.P. had not abandoned N.T. during her pregnancy and that M.P. had not learned of A.A.T.'s birth until December 24 or 25, 2004. Still, the court further found that M.P. "should have known and did suspect [N.T.] was still pregnant with his child and she gave birth to his child." Under these circumstances, M.P. "should have taken action to determine whether [N.T.] had had an abortion or was still pregnant . . . and . . . gave birth to his child."

The district court ruled against M.P. on his argument under K.S.A. 59-2213, which provides that a court shall have continuing control over its own probate orders, judgments, and decrees for 30 days. Under this statute, the court held M.P.'s effort to set aside the adoption decree was time-barred.

The district court also rebuffed M.P.'s arguments under K.S.A. 60-260(b), which controls vacation or modification of probate judgments after the 30-day time limit of K.S.A. 59-2213 has passed. Under K.S.A. 60-260(b)(2), the court refused to set aside the adoption decree based on newly discovered evidence because "M.P. should have taken action to verify whether N.T. had an abortion." Under subsection (b)(3), which allows a judgment to be set aside for fraud, the district court ruled that N.T. was not an adverse party and that fraud justifying relief must have been committed by an adverse party. The court also rejected subsection (b)(4) as a basis for setting aside the adoption decree as void; in the court's view, although M.P. did not have notice of the adoption proceeding, the decree was not void because, again, "[M.P.] should have taken action to protect his parental rights." Finally, the court considered the so-called catch-all provision of subsection (b)(6) and determined M.P. was not entitled to relief under that provision.

## Arguments Raised on Appeal

M.P. relies on K.S.A. 60-260(b) in this appeal, transferred to this court from our Court of Appeals pursuant to K.S.A. 20-3017 and Supreme Court Rule 8.02 (2007 Kan. Ct. R. Annot. 62). He first asserts that the adoption decree was void under K.S.A. 60-

260(b)(4) because he did not receive notice of the proceeding in violation of his rights to substantive and procedural due process. M.P. argues that he had a constitutionally protected liberty interest in his fatherhood of A.A.T. and that he could not be deprived of it without his consent or compliance with the Kansas Adoption and Relinquishment Act (Act), K.S.A. 59-2111 through K.S.A. 59-2144, *i.e.*, due process of law. He asserts that N.T.'s fraud cut off his ability to assert his interest before the adoption decree was entered and that his only recourse has been his timely and diligent prosecution of this action. Because his consent was required and not obtained and there was no other basis to support termination of his parental rights, M.P. argues, the adoption decree is void.

In response, the adoptive parents argue that M.P. had a mere biological link and bore the burden to discover A.A.T.'s existence and transform that biological link into a full and enduring relationship worthy of constitutional protection. They also assert that M.P. was not denied due process because he "wholly neglected his parental responsibilities" and therefore the Act constitutionally allowed termination of his parental rights.

We also have the benefit of an *amicus* brief filed by the American Academy of Adoption Attorneys, which argues that a child has a constitutional interest in the protection of his or her "established family," here, the adoptive parents. The Academy contends this right must trump any mere "possessory" right of another. The Academy also supports the adoptive parents' responses to M.P.'s issues, arguing that the district court did not abuse its discretion by refusing to set aside the decree and that substantial competent evidence supported termination of M.P.'s parental rights under K.S.A. 59-2136(h).

If we do not accept M.P.'s argument that the adoption is void, he argues alternatively that (1) the district court misinterpreted the phrase "adverse party" in K.S.A. 60-260(b)(3), meaning the decree must be set aside on the basis of N.T.'s fraud and (2) the district court abused its discretion by failing to set aside the decree because of newly discovered evidence under K.S.A. 60-260(b)(2), specifically evidence of M.P.'s identity as A.A.T.'s biological father.

M.P. does not argue for relief under K.S.A. 60-260(b)(6); instead, he argues the district court erred in relying upon the provision because it applies only if there is no other applicable grounds for relief and, according to him, three other provisions do apply.

*Analysis*

K.S.A. 60-260 expressly provides for relief from district court decisions in certain circumstances. See *In re Marriage of Leedy*, 279 Kan. 311, 321, 109 P.3d 1130 (2005). K.S.A. 60-260(b) reads in pertinent part:

"On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: . . . (2) newly discovered evidence . . .; (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void . . . . The motion shall be made within a reasonable time, and for reasons . . . (2) and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subsection (b) does not affect the finality of a judgment or suspend its operation. This section does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or . . . to set aside a judgment for fraud upon the court."

## Issue 1: Is the Adoption Decree Void?

The parties disagree about the proper standard of review applicable to the first issue raised by M.P., *i.e.*, whether the adoption decree is void under K.S.A. 60-260(b)(4). M.P. seeks application of a de novo standard. The adoptive parents argue for an abuse of discretion standard.

Although abuse of discretion is generally the correct standard for review of district court decisions under K.S.A. 60-260(b), see *In re Marriage of Reinhardt*, 38 Kan. App. 2d 60, Syl. ¶ 1, 161 P.3d 235 (2007), this is not so when a judgment is attacked as void under K.S.A. 60-260(b)(4). A judgment is void and therefore a nullity if a court lacked jurisdiction to render it or acted in a manner inconsistent with due process. *Automatic Feeder Co. v. Tobey*, 221 Kan. 17, 21, 558 P.2d 101 (1976); *Board of Jefferson County Comm'rs v. Adcox*, 35 Kan. App. 2d 628, 635-36, 132 P.3d 1004 (2006). A district court has no discretion to exercise in such a case; either a judgment is valid or it is void as a matter of law. Thus, a

reviewing appellate court must apply a de novo standard once a district court has made the necessary findings of fact. See *In re Marriage of Hampshire*, 261 Kan. 854, 862, 934 P.2d 58 (1997); *Adcox*, 35 Kan. App. 2d at 635.

The necessary, underlying findings of fact are reviewed under a different standard of review: Findings of fact are reviewed on appeal to determine if they are supported by substantial competent evidence and are sufficient to support the conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a finding. *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007). An appellate court must not reweigh the evidence, substitute its evaluation of the evidence for that of the district court, or pass upon the credibility of the witnesses. See *In re Estate of Sauder*, 283 Kan. 694, 718, 156 P.3d 1204 (2007).

### Underlying Findings of Fact

In this case, many of the district court's findings of fact are not disputed. For example, there is no disagreement with the findings that N.T. lied to M.P. and took extraordinary measures to prevent him from knowing about the birth of his child. Nor is it disputed that N.T. falsified her affidavit and gave false information to the court regarding the identity of the putative father. Also, the parties do not dispute the district court's finding that the adoption agency and the adoptive parents acted in good faith and without knowledge of N.T.'s deceptions.

Arguments are made regarding other findings, however. As evidenced by the separate opinions of this court, some disagree with the district court's findings that M.P. "should have known and did suspect [N.T.] was still pregnant with his child and she gave birth to his child" and that he took no action to protect his parental rights. Although the evidence could be reweighed to reach contrary findings regarding whether M.P. should have known of the continued pregnancy and the birth, that is not our role. Our task is to determine if the district court's findings are supported by substantial competent evidence, and we conclude they are. In fact, M.P. testified to his suspicions and his inaction.

Other evidence establishes that had he acted on those suspicions, it would have required relatively little effort for M.P. to have discovered the continued pregnancy or the birth of the child. N.T. testified that, although she discouraged contact between M.P. and her mother, her mother would have confirmed the continued pregnancy had M.P. asked. In addition, through M.P.'s phone records he could determine where N.T. was, and he had a Wichita address for N.T.'s sister.

*Fourteenth Amendment Framework*

In light of these circumstances, we must determine whether M.P. had a constitutionally protected liberty interest under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the only basis M.P. asserts for his claim that he was entitled to notice of the adoption proceeding. The Due Process Clause is invoked only when the State takes action to deprive any person of life, liberty, or property. *Lehr v. Robertson*, 463 U.S. 248, 256, 77 L. Ed. 2d 614, 103 S. Ct. 2985 (1983).

If life, liberty, or property is at stake, procedural due process requires the State to provide notice of a potential deprivation of the interest and an opportunity to be heard regarding the deprivation. *Baldwin v. Hale*, 68 U.S. (1 Wall) 223, 233, 17 L. Ed. 531 (1863). It is necessarily implied that both the notice and opportunity to be heard must be provided at a meaningful time and in a meaningful manner to comport with the constitutional guarantee. *Fuentes v. Shevin*, 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972); *Armstrong v. Manzo*, 380 U.S. 545, 14 L. Ed. 2d 62, 85 S. Ct. 1187 (1965); *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1275, 136 P.3d 457 (2006).

In arguing that he has a liberty interest, M.P. relies upon the United States Supreme Court's recognition of a natural parent's right to "the companionship, care, custody, and management" of his or her child as a liberty interest far more important than any property right. *Santosky v. Kramer*, 455 U.S. 745, 758-59, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982); *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 68 L. Ed. 2d 640, 101 S. Ct. 2153 (1981); see also *Wisconsin v. Yoder*, 406 U.S. 205, 32 L. Ed. 2d

15, 92 S. Ct. 1526 (1972) (parents have protected liberty interest in controlling their children's religious upbringing); *Pierce v. Society of Sisters*, 268 U.S. 510, 69 L. Ed. 1070, 45 S. Ct. 571 (1925) (parents have protected liberty interest in the way they choose to educate their children); *Meyer v. Nebraska*, 262 U.S. 390, 67 L. Ed. 1042, 43 S. Ct. 625 (1923) (parents have protected liberty interest in controlling their children's education). Similarly, this court has long recognized that "parental rights are fundamental in nature and are constitutionally protected." *In re Adoption of McMullen*, 236 Kan. 348, 352, 691 P.2d 17 (1984).

Obviously, the liberty interest of a natural parent has its origin in the biological connection between the parent and the child. Nevertheless, a biological relationship does not guarantee the permanency of the parental rights of an unwed natural father. See *In re K.M.H.*, 285 Kan. 53, 77, 169 P.3d 1025 (2007), *cert. denied* 129 S. Ct. 36 (2008) (no parental rights arose for sperm donor who had no written agreement with mother). Rather, "[t]he significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring." *Lehr*, 463 U.S. at 262. The opportunity is lost, however, if the natural father does not come forward to "demonstrate[] a full commitment to the responsibilities of parenthood." 463 U.S. at 261.

*Decisions Regarding Unwed Fathers*

Several decisions of the United States Supreme Court establish this principle and emphasize the importance of an actual relationship of parental responsibility as distinguished from a mere biological relationship.

In the earliest of the Supreme Court decisions involving an unwed father, *Stanley v. Illinois*, 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972), the Court clarified that the liberty interest of a natural parent could attach to an unwed father. Therefore, an Illinois statute that conclusively presumed every father in such circumstances to be an unfit parent was declared unconstitutional.

Peter Stanley, Sr., although not married to his children's mother, had always acted as a parent to them and had lived periodically

with their mother for 18 years. When the mother died, the children were immediately made wards of the state and were eligible for adoption. Stanley claimed he was denied due process of the law because he was refused a hearing on his fitness as a parent before his children were declared wards. The Supreme Court agreed, finding he was entitled to a hearing. 405 U.S. at 658-59; compare *Armstrong*, 380 U.S. at 550 (recognizing divorced natural father's liberty interest in parental relationship, requiring notice of adoption proceedings to satisfy due process).

Six years after *Stanley*, the Court decided *Quilloin v. Walcott*, 434 U.S. 246, 254, 54 L. Ed. 2d 511, 98 S. Ct. 549, *reh. denied* 435 U.S. 918 (1978), addressing the rights of an unwed father in a stepparent adoption and whether those rights were protected adequately by application of a " 'best interests of the child' " standard.

Under Georgia law, an unwed father who had not legitimated his child was not permitted to object to an adoption. Leon Webster Quilloin had not petitioned to legitimize his 11-year-old before the adoption petition was filed; and he had never sought actual or legal custody or otherwise assumed any significant responsibility with respect to the child's supervision, education, protection, or care. In these circumstances, the Court held, Quilloin had not grasped his opportunity to assert his constitutional rights, and due process did not require any more than a finding that the adoption and denial of legitimation were in the best interests of the child. 434 U.S. at 255.

The Court followed its *Quilloin* decision with *Caban v. Mohammed*, 441 U.S. 380, 60 L. Ed. 2d 297, 99 S. Ct. 1760 (1979). In *Caban*, a putative father challenged a New York statute that allowed an unwed mother to veto the adoption of her child by withholding consent but prevented an unwed father from doing so without showing the adoption was not in the best interests of the child. Appellant Abdiel Caban had developed substantial relationships with his 6-and 4-year-old children before the adoption proceedings began.

The Court held that New York did not have a compelling interest in treating Caban differently from the children's mother and thus the statute violated equal protection. 441 U.S. at 394. Although the

Court stated that a difference between maternal and paternal roles in the care of a newborn might justify distinct treatment, it suggested that any gender distinction between parents would become less acceptable as a basis for legislative line drawing as a child grows older. 441 U.S. at 388-89.

The analysis in *Stanley, Quilloin,* and *Caban,* which established that an unwed father who admitted paternity and had established a substantial relationship with his child would be able to protect his rights under due process and equal protection theories, provided the necessary stepping stones for the Court's 1983 opinion in *Lehr,* 463 U.S. 248, which focused upon the right to notice in an adoption proceeding.

Jonathan Lehr, an unwed father, was not given actual notice of his 2-year-old child's proposed adoption and sought to have it declared void because the lack of notice violated his constitutional rights to due process and equal protection. During his child's life, Lehr did nothing to protect his legal interest; he filed no legal actions and did not file with New York's putative father registry.

In discussing whether Lehr had a liberty interest, the Court reaffirmed its holdings in *Caban, Quilloin,* and *Stanley,* noting that a mere biological connection did not give rise to a liberty interest. *Lehr,* 463 U.S. at 261. Further echoing its previous holdings, the Court emphasized the natural father's opportunity ripens into a liberty interest only when he "grasps that opportunity and accepts some measure of responsibility for the child's future." 463 U.S. at 262. The Court warned that if the father "fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie." 463 U.S. at 262.

Throughout the opinion, the Court continued to emphasize the "constitutional importance of the distinction between an inchoate and a fully developed relationship." 463 U.S. at 261 n.17. Comparing *Stanley* and *Caban,* in which the Court recognized a developed parent-child relationship, with *Quilloin,* in which the relationship was not recognized, the Court contrasted the strength of the resulting due process protection:

"When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,'

[citation omitted], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. . . . But the mere existence of a biological link does not merit equivalent constitutional protection." 463 U.S. at 261.

The Court held Lehr did not have a fully protected interest, stating: "In this case, we are not assessing the constitutional adequacy of New York procedures for terminating a *developed* relationship. Appellant has never had any significant custodial, personal, or financial relationship with [his child], and he did not seek to establish a legal tie until after she was two years old." (Emphasis added.) 463 U.S. at 262.

The majority did not expand upon the facts that gave rise to this conclusion. In contrast, the dissenting opinion focused upon Lehr's efforts, discussing Lehr's substantial attempts to develop a personal and financial relationship with his child and, albeit late, a legal relationship. The dissent explained that Lehr lived with the child's mother during the pregnancy, and the mother acknowledged to friends and relatives that Lehr was the child's father. After the child was born, Lehr visited the hospital every day. The mother falsely told Lehr she had identified him as the child's father on state forms.

Upon her discharge from the hospital, however, the mother thwarted any future relationship between Lehr and his child. Over the next 2 years, the mother attempted to conceal the child. Occasionally, Lehr would locate the mother and child, at which times he would visit the child to the extent the mother would allow. Each time, the mother would move again. At one point Lehr hired a detective agency when he was unable to locate his child. Through these efforts, he again made contact and learned that the mother had married. At that point, the mother threatened Lehr with arrest if he did not stay away. As a result, Lehr hired an attorney and requested visitation. During this time, Lehr's offers of financial assistance had been refused.

As soon as Lehr threatened legal action, the mother's husband initiated adoption proceedings with the mother's consent. Lehr was not given notice of the proceeding, and, in a different court, he filed a petition requesting a determination of paternity, an order of support, and reasonable visitation privileges. At some point be-

fore the adoption was finalized, the mother's attorney advised the judge of the pending paternity action. The judge in the adoption proceeding stayed the paternity action, and, as a result of the stay, Lehr became aware of the adoption proceeding. Lehr's attorney then called the judge in the adoption proceeding and was advised the adoption had been finalized earlier in the day.

Apparently, none of these facts was relevant to the majority's determination of the case because the majority did not mention Lehr's efforts to establish a relationship with his child or the mother's efforts to thwart the development of the relationship; the majority noted only that Lehr had not filed with New York's putative father registry or otherwise protected his legal rights until after the adoption was filed. The Supreme Court's focus was upon whether the state of New York had "adequately protected his opportunity to form such a relationship." 463 U.S. at 262-63.

Considering New York's statutes regarding notice requirements in adoption proceedings, the Supreme Court concluded the provisions adequately protected putative fathers and were designed to include "putative fathers who are likely to have assumed some responsibility for the care of their natural children. If this scheme were likely to omit many responsible fathers, and if qualification for notice were beyond the control of an interested putative father, it might be thought procedurally inadequate." 463 U.S. at 263-64. The classifications into which most responsible fathers were deemed to fall included men who had married the mother, had been identified as the father by the mother in a sworn statement, had filed with the putative father registry, had been adjudicated as the father, had been identified as the father on the birth certificate, or had lived with the mother and child and held himself out as the father. Lehr was not a member of any of those classes.

Of these various classifications and available remedies, the district court had focused upon Lehr's failure to file with New York's putative father registry, a remedy totally within his control, and concluded he was not entitled to notice because he had not registered. On appeal, the Supreme Court concluded that imposing a registration requirement was not "arbitrary" because strict compliance with the procedure furthered the State's legitimate interest

in facilitating adoptions. The court noted an open-ended notice requirement would burden adoptions, threaten the unwed birth mother's privacy, and impair the finality of adoptions. Given those goals, the Court rejected an argument that ignorance of the registry should excuse the failure to file a putative father notice. 463 U.S. at 264-65.

Ultimately, the Supreme Court determined there were steps that Lehr could have taken that made "the right to receive notice . . . completely within [Lehr's] control," and his failure to take advantage of available legal procedures doomed his assertion that he had fully seized the opportunity to establish a relationship with his child. See 463 U.S. at 264; see also *Quilloin*, 434 U.S. 256 (holding Georgia statute requiring unmarried father to legitimate child in order to have veto authority over adoption did not deprive him of due process or equal protection rights).

The Court also rejected Lehr's equal protection claim, reasoning that Lehr and the child's mother were not similarly situated because the mother had had a custodial relationship with the child while Lehr had not. *Lehr*, 463 U.S. at 267-68.

*Newborn Adoption Cases*

Although *Lehr* and the other decisions of the Supreme Court provide guidance, none address a newborn adoption, leaving it to the state courts to determine how to measure whether a putative father of a newborn child has fully and completely grasped his opportunity to parent. See Note, *He Said, She Said: Diverging Views in the Emerging Field of Fathers' Rights*, 46 Washburn L.J. 163, 180 (Fall 2006) ("Although the Supreme Court has offered guidance in cases involving unwed fathers and older children, it has been slow to address the rights of unwed fathers in newborn adoptions. . . . The Court's reluctance suggests that it is currently 'unwilling to address the question of whether an unwed father has a legal interest in—and thus the right to veto the adoption of—a child he sired out of wedlock and with whom he has not yet had an opportunity to develop a relationship.' "); Resnik, *Seeking the Wisdom of Solomon: Defining the Rights of Unwed Fathers in Newborn Adoptions*, 20 Seton Hall Legis. J., 363, 389-90 (1996) ("The

Supreme Court has avoided addressing the issue of newborn adoptions in its past unwed father decisions. . . . [R]ecent refusals to grant certiorari in [such] cases . . . indicate that the Supreme Court remains unwilling to address the question of whether an unwed father has a legal interest in—and thus the right to veto the adoption of—a child he sired out of wedlock and with whom he has not yet had an opportunity to develop a relationship" and "[t]he Supreme Court's obstinacy has left the states wide latitude in crafting solutions to the dilemma posed by unwed fathers and newborn adoptions.").

Two of the first newborn adoption cases to apply *Lehr*'s requirement that the putative father must have taken some measure of the responsibility for the child's future were *Matter of Baby Girl S.*, 141 Misc. 2d 905, 535 N.Y.S.2d 676 (1988), *aff'd without op.* 150 A.D.2d 993, 543 N.Y.S.2d 602 (1989), *aff'd sub nom. Matter of Raquel Marie X.*, 76 N.Y.2d 387, 559 N.Y.S.2d 855, 559 N.E.2d 418, *cert. denied sub nom. Robert C. v. Miguel T.*, 498 U.S. 984 (1990), and its companion, *Matter of Raquel Marie X.*, 76 N.Y.2d 387.

New York's highest court, considering the consolidated appeal of the two cases, first compared *Caban* with *Quilloin* and *Lehr*. From those cases, the New York court discerned that "it is apparent that the biological parental interest can be lost entirely, or greatly diminished in constitutional significance, by failure to timely exercise it or by failure to take the available legal steps to substantiate it." 76 N.Y.2d at 402. Based upon this concept, the New York court concluded that the father of a newborn child is entitled to constitutional protection of his rights "so long as he *promptly* avails himself of *all* the possible mechanisms for forming a legal and emotional bond with his child." (Emphasis added.) 76 N.Y.2d at 402; see also *Matter of Robert O. v. Russell K.*, 80 N.Y.2d 254, 263, 590 N.Y.S.2d 37, 604 N.E.2d 99 (1992) (father must " promptly take[] every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his child' "). In *Matter of Baby Girl S.* and *Matter of Raquel Marie X.*, the court determined the putative fathers in both cases had met this standard. 76 N.Y.2d at 402-03.

The tests formulated by other courts have been similar, although most have stopped short of the New York requirement that *all* available opportunities must have been seized. *E.g., Adoption of Kelsey S.*, 1 Cal. 4th 816, 849, 4 Cal. Rptr. 2d 615, 823 P.2d 1216 (1992) (father must "promptly come forward and demonstrate a full commitment to his parental responsibilities"); *In re Adoption of B.G.S.*, 556 So. 2d 545, 550 (La. 1990) (father of newborn child must "demonstrate that he is fit and committed to the responsibilities of parenthood" and "show that he has taken concrete actions to grasp his opportunity to be a father"); *Heidbreder v. Carton,* 645 N.W.2d 355, 372-73 n.12 (Minn.), *cert. denied* 537 U.S. 1046 (2002) (father must "affirmatively demonstrate a commitment" to parenting responsibilities; merely maintaining contact with mother by e-mail, contacting attorney, and attempting to locate mother does not indicate an "intent to rear the child"); *In re Dixon,* 112 N.C. App. 248, 251, 435 S.E.2d 352 (1993) (father must discover birth of child and take statutory steps to demonstrate his commitment to child); *In re Baby Boy K.,* 546 N.W.2d 86, 97 (S.D. 1996) ("Because children require early and consistent nurturing of their emotional as well as physical needs, an unwed father must act quickly to grasp the opportunity interest in his biological child."); *In re Adoption of B.V.,* 33 P.3d 1083, 1086 (Utah App. 2001) (unwed biological father " ' "must fully and strictly comply" ' " with statutory conditions or " ' "is deemed to have waived and surrendered any right in relation to child" ' "; he must initiate proceeding to establish paternity, and if he has knowledge of the pregnancy, pay reasonable amount of expenses); *In re C.L.*, 178 Vt. 558, 560-61, 878 A.2d 207 (2005) (father must assume responsibilities in "reasonable" time and reasonableness judged from the perspective of the child's needs); Parness, *Participation of Unwed Biological Fathers in Newborn Adoptions: Achieving Substantive and Procedural Fairness,* 5 J. L. & Fam. Stud. 223, 229-30 (2003) ("paternity standards often require that proof of biological ties be accompanied by some conduct prior to birth or around the time of birth that evinces 'a settled purpose to assume parental duties' "; "unwed fathers who step up at birth to raise their children can be too late, as they may have failed to provide adequate prebirth sup-

port, at times even [though] their attempts were thwarted by unwed mothers"); Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson*, 45 Ohio St. L.J. 313, 364 (1984) ("The need for early assurance of permanence and stability is an essential factor in the constitutional determination of whether to protect a parent's relationship with his or her child. The basis for constitutional protection is missing if the parent seeking it does not take on the parental responsibilities timely.").

The outcomes in these cases are not perfectly consistent, given variability in fact situations and state laws. See Parness, 5 J. L. & Fam. Stud. at 237. Some states limit the time period during which an adoption can be set aside, regardless of the circumstances; some require statutory compliance with procedures such as filing with a putative father registry; and others specify criteria to be used in judging motions to set aside.

Despite these differences, as we synthesize these holdings, common factors emerge. In general, a putative father has a liberty interest affording a right to notice of proceedings to adopt his newborn child if he: (1) diligently took affirmative action that manifested a full commitment to parenting responsibilities and (2) did so during the pregnancy and within a short time after he discovered or reasonably should have discovered that the biological mother was pregnant with his child.

Regarding the first factor, to determine if a natural father of a newborn child has taken diligent, affirmative action, courts measure the putative father's efforts to make a financial commitment to the upbringing of the child, to legally substantiate his relationship with the child, and to provide emotional, financial, and other support to the mother during the pregnancy. Following the holdings in *Quilloin* and *Lehr*, often courts have required the father to use those legal mechanisms within his control that would entitle him to notice under the state's statutes, *i.e.*, acknowledge or prove paternity, agree to a support order, or file with a putative father registry, and have done so even if a statute does not specify that adherence is required. *E.g., Allen v. Allen*, 48 F.3d 259 (7th Cir. 1995) (no constitutional infirmity in state court proceedings in which biological father was excluded because he had failed to es-

tablish parentage according to state law); *In re Adoption of S.J.B.*, 294 Ark. 598, 745 S.W.2d 606 (1988) (failure of father to inquire into possibility of pregnancy or bring paternity action meant no due process interest); *D.L.G., Sr. v. E.L.S.*, 774 S.W.2d 477 (Mo. 1989) (due process did not require notice of adoption where biological father failed to legally establish paternity); *Friehe v. Schaad*, 249 Neb. 825, 545 N.W.2d 740 (1996) (failure to file notice of intent to claim paternity within 5 days of child's birth as required by statute curtailed father's rights in adoption proceedings).

This principle has been applied in many cases where the father was unaware of the child's existence. See, *e.g.*, *In re Adoption of S.J.B.*, 294 Ark. 598, 600, 745 S.W.2d 606 (1988) (although father unaware of child, notice of adoption proceeding not constitutionally required when "biological father was not interested enough in the outcome of his sexual encounter . . . to even inquire concerning the possibility of her pregnancy"); *In re Zacharia D.*, 6 Cal. 4th 435, 452-53, 24 Cal. Rptr. 2d 751, 862 P.2d 751 (1993) (biological father unaware of paternity until child 15 months old not constitutionally entitled to reunification services); *In re Tinya W.*, 328 Ill. App. 3d 405, 409-10, 765 N.E.2d 1214, 1218 (2002) (court properly found father unfit based on failure to provide any financial or emotional support to child, despite father's lack of awareness of paternity); *In re Paternity of Baby Doe*, 734 N.E.2d 281 (Ind. App. 2000) (State's interest in child's early permanent placement precludes father from contesting adoption when unaware of paternity, not timely included on putative father registry).

The second factor—timeliness or promptness of the father's action—has been emphasized, often being cited as the most critical factor. In a newborn adoption, the father's opportunity to make a commitment to parenting must have been grasped during the pregnancy and in a prompt and timely manner as measured by the fleeting opportunity availed to the father under the circumstances of the case, in other words, within a short time after he discovered or reasonably should have discovered that the mother was pregnant with his child.

The need for promptness reflects the reality of the newborn adoption situation, which provides the father with only a limited

time in which to act. *Petition of Steve B.D.*, 112 Idaho 22, 25, 730 P.2d 942 (1986). The necessity of promptness results from two primary considerations. First, in a newborn adoption case, the window of opportunity for a father to have grasped an opportunity interest is constrained by the biological reality that the mother bears the child during pregnancy. As one court noted, during a pregnancy a mother must make many important decisions including whether to have an abortion, prepare an adoption plan, or keep the child. Recognizing that the natural mother, in making these decisions, "may well need emotional, financial, medical, or other assistance," the court concluded the natural father, as one of two people responsible for the pregnancy, must have " 'promptly' demonstrated a 'full commitment' to parenthood *during pregnancy* and within a short time after he discovered or reasonably should have discovered that the biological mother was pregnant with his child." *Adoption of Michael H.*, 10 Cal. 4th 1043, 1054, 43 Cal. Rptr. 2d 445, 898 P.2d 891 (1995), *cert. denied sub nom. Mark K. v. John S.*, 516 U.S. 1176 (1996). While a father cannot assume the physical aspects of pregnancy, he may assist with the financial and emotional aspects of the pregnancy and assure the mother of his commitment to fully assume parenting responsibilities both during the pregnancy and throughout the child's lifetime, including being a sole parent if necessary.

The second reason a natural father's actions must be timely was emphasized in *Lehr v. Robertson*, 463 U.S. 248, 263-64 n.20, 77 L. Ed. 2d 614, 103 S. Ct. 2985 (1983): States have an interest in being able to determine as early as possible in a child's life the rights, interests, and obligations of all parties, in eliminating the risk of unnecessary controversy that might impair the finality of an adoption, in encouraging adoptions, in protecting the adoption process from unnecessary controversy and complication, and in protecting the privacy and liberty interests of the natural mother and all parties to the adoption. As the California court stated in *Adoption of Michael H.*:

"[I]f an unwed father is permitted to ignore his parental role during pregnancy but claim it after birth, it will often be very difficult to know with certainty whether he will be able to successfully contest an adoption until after the child is born.

This uncertainty could well dissuade prospective adoptive parents from attempting to adopt the children of unwed mothers who . . . have chosen for whatever reason not to keep their child and raise it themselves. And that result would frustrate the state's clear interest in encouraging such adoptions and providing stable homes for children. [Citations omitted.]" 10 Cal. 4th at 1056.

In addition, the finalization of an adoption gives rise to a legal relationship between the adoptive parents and the child, creating liberty interests. See *Smith v. Organization of Foster Families*, 431 U.S. 816, 844 n.51, 53 L. Ed. 2d 14, 97 S. Ct. 2094 (1977) (adoptive parenthood is "legal equivalent of biological parenthood"); K.S.A. 38-1111 ("parent and child relationship" defined as "the legal relationship existing between a child and the child's biological or adoptive parents").

In this case, M.P. did not diligently take affirmative action that manifested a full commitment to parenting responsibilities during the pregnancy and within a short time after he discovered N.T. was pregnant with his child. In fact, M.P. does not suggest he took affirmative steps that demonstrated his commitment to parenting. His only suggestion regarding his assumption of parental duties is a statement in his brief that "N.T. knew M.P. would have done anything N.T. asked to support her during her pregnancy." However, standing ready and being willing to provide support is insufficient; parenting responsibilities must be assumed; affirmative action must be taken. Furthermore, the record does not evidence any support, financial or otherwise, being provided, with the exception of some insignificant financial payments of $200 for airfare and "$20 here, $20 there."

Tellingly, M.P. offers no explanation of his failure to act during the time between his learning of the pregnancy and N.T.'s lie about the abortion, the period when N.T. was making decisions regarding adoption. Later, there was no attempt to locate N.T., confirm the pregnancy, substantiate his legal rights, or take other action even though the district court found that M.P. "should have known and did suspect [N.T.] was still pregnant with his child and she gave birth to his child."

M.P. failed to grasp the fleeting opportunity available to him to establish a firm commitment to parenting.

*Fraud*

M.P. suggests, however, that these considerations do not apply when the father's ability to commit to fatherhood is thwarted by the mother's actions. He suggests the calculus changes from a biology-plus-developed-parenting-relationship formula to a biology-plus-fraud formula when the natural mother is an active agent in preventing actual notice to the natural father.

This issue has not been addressed directly by the United States Supreme Court. Clearly though, in *Lehr*, the majority did not consider the mother's efforts to thwart the father as even deserving of mention. In contrast, the mother's actions were a focus of the dissenting opinion and explain much of the difference in analysis between the two opinions. Nevertheless, the *Lehr* majority did note "[t]here is no suggestion in the record that [the mother] engaged in fraudulent practices that led [the father] not to protect his rights." 463 U.S. at 265 n.23. Thus, the question of whether fraud would change the Supreme Court's view was left unanswered.

State courts have faced the issue, however. The cases reflect that mothers, with some frequency and for a variety of reasons (many of which are very weighty), fail to provide information regarding the putative father or provide inaccurate information. Gonzalez, *The Rights of Putative Fathers to Their Infant Children in Contested Adoptions: Strengthening State Laws that Currently Deny Adequate Protection*, 13 Mich. J. Gender & L. 39, 67-68 (2006) (discussing personal safety, privacy interests of mother, and other considerations). When this happens, competing interests are pitted against each other, including the mother's constitutionally protected privacy interest. See *Evans v. S.C. Dept. of Social Security*, 303 S.C. 108, 110, 399 S.E.2d 156 (1990); Note, *The Unwed Father and the Right to Know of His Child's Existence*, 76 Ky. L. J. 949 (1988); Gonzalez, 13 Mich. J. Gender & L. at 67-68.

Although there are variances, in general, the cases have not focused upon the natural mother's intent, the reason she was not forthcoming, whether the fraud was concealment by silence (simply failing to inform the father or the court of information) or active (knowingly misstating information), or whether the fraud was in-

trinsic or extrinsic. Rather, the analysis has focused upon whether the State is justified in ending the putative father's opportunity to develop a relationship and in recognizing the finality of the adoption even though the father's opportunity was burdened and truncated by the birth mother's fraud.

In general, the cases conclude that as long as the state's statutes provide a process whereby most responsible putative fathers can qualify for notice in an adoption proceeding, the interests of the State in the finality of adoption decrees, as discussed in *Lehr*—providing a child stability and security early in life, encouraging adoptions, protecting the adoption process from unnecessary controversy and complication, and protecting other parties' privacy and liberty interests—justify a rule that a putative father's opportunity to develop a parenting relationship ends with the finalization of a newborn child's adoption even if the reason the father did not grasp his opportunity was because of the mother's fraud. See *Lehr*, 463 U.S. at 264-65.

This conclusion is supported by the decision in *Matter of Robert O. v. Russell K.*, 80 N.Y.2d 254, 590 N.Y.S.2d 37, 604 N.E.2d 99 (1992). In that case, New York's highest court concluded a putative father who had assumed no responsibility during a pregnancy did not have a due process interest even though the father was unaware of the child's birth until after the adoption had been finalized. The natural parents were living together at the time of conception but, soon thereafter, the father moved out and terminated contact with the mother. The mother did not inform the father of the pregnancy, apparently because she did not want him to believe she was trying to coerce him into reconciliation. The mother placed the child for adoption. Later, the natural parents reconciled and married. Then, 18 months after the birth and 10 months after the adoption was finalized, the mother ended her fraud by silence and told the father of his child. As in this case, once learning of his child's birth, the father immediately and diligently took action to assert his legal connection with the child.

The New York court concluded, however, that this was too late and rejected the father's suggestion that "the Constitution also protects the custodial opportunity of the 'unknowing' unwed father

who does nothing to manifest his parental willingness before placement because he is unaware of the child's existence." 80 N.Y.2d at 262-63. The court emphasized that "the opportunity, of limited duration, to manifest a willingness to be a parent . . . becomes protected only if grasped." 80 N.Y.2d at 265. The court concluded:

"[T]he timing of the father's actions is the 'most significant' element in determining whether an unwed father has created a liberty interest. [Citation omitted.] States have a legitimate concern for prompt and certain adoption procedures and their determination of the rights of unwed fathers need not be blind to the 'vital importance' of creating adoption procedures possessed of 'promptness and finality,' promoting the best interests of the child, and protecting the rights of interested third parties like adoptive parents (*Lehr v. Robertson*, [463 U.S.] at 263-66 n.25). Recognizing those competing interests—all of which are jeopardized when an unwed father is allowed to belatedly assert his rights . . . the period in which the biological father must manifest his parental interest is limited in duration: if the father's actions are untimely, the State can deny a right of consent. . . .

"To conclude that petitioner acted promptly once he became aware of the child is to fundamentally misconstrue whose timetable is relevant. Promptness is measured in terms of the baby's life not by the onset of the father's awareness. The demand for prompt action by the father at the child's birth is neither arbitrary nor punitive, but instead a logical and necessary outgrowth of the State's legitimate interest in the child's need for early permanence and stability." 80 N.Y.2d at 264.

In *Matter of Robert O.*, the majority and concurring opinion debated whether the opportunity was a constitutionally protected interest subject to a balancing of interests under a traditional due process test or was merely an opportunity that became extinguished once the adoption was finalized. The majority adopted the latter view because the inchoate interest had never ripened into a liberty interest. 80 N.Y.2d at 265. Compare *Lehr*, 463 U.S. at 270 (White, J., dissenting) (criticizing majority for using weight rather than nature of interest at stake) with *Wells v. Children's Aid Soc. of Utah*, 681 P.2d 199 (Utah 1984) (using balancing to determine strength of protection to be afforded biological father), and *Adoption of Michael H.*, 10 Cal. 4th at 1055 (weighing various interests when determining whether father promptly and diligently grasped opportunity to parent).

The South Dakota Supreme Court adopted a similar rationale in *In re Baby Boy K.*, 546 N.W.2d 86 (S.D. 1996), a case where

the natural mother misrepresented the natural father's identity to the court:

"When a putative father is ignorant of his parenthood due to his own fleeting relationship with the mother and her unwillingness to later notify him of her pregnancy, the child should not be made to suffer. The trial court in this case was faced with a child who was unwanted by his mother and unknown to his father. After sixty days had passed and no one had asserted a paternal interest, the State's obligation to provide this unwanted and unclaimed child with a permanent, capable, and loving family became paramount. [Father's] assertion, another month later, that Mother should have told him if he happened to father a child, cannot overcome the State's fully matured interest in protecting the child's permanent home.

"We also note Mother's alleged dishonesty was a private act in which the State was also deceived. [Father] cannot claim illegal state action where the State was itself a victim rather than a perpetrator. [Citation omitted.]" 546 N.W.2d at 101.

Yet another example of a case using a similar analysis is *Petition of Steve B.D.*, 112 Idaho 22, a case relied upon by the adoptive parents in this case. In *Steve B.D.*, the natural mother misrepresented the identity of the natural father to the court. The father was aware of the child's birth, but the mother engaged in an elaborate scheme to hide the adoption proceeding from the father. At the same time, she hid the father's identity from those involved in the adoption.

In considering whether the father had a liberty interest, the Idaho court did not allow the mother's deceptions to serve as an excuse for the father's failure to establish a relationship with his child:

"As previously observed, a violation of the Fourteenth Amendment cannot be premised upon the independent actions of a private individual. The essential fact is that [the father] failed to initiate either contact with the child or any legal actions to establish his interest, whether or not [the father] was to blame for these failures." 112 Idaho at 26.

The court emphasized that an unwed father's "fleeting opportunity may pass ungrasped through no fault of the unwed father or perhaps due to the interference of some private third party; nevertheless, once passed, the unwed father is left without an interest cognizable under the Fourteenth Amendment." 112 Idaho at 25 (citing *Lehr*, 463 U.S. at 267-68).

Finally, the court noted that the adoption proceedings had progressed for 4 months by the time the father asserted his desire to parent the child. Balancing the various interests, the court concluded the adoption should not be set aside:

"By that point, the time had passed for [the father] to assert an interest in a relationship with the child sufficient to reverse the already well-advanced adoption proceedings and sever the already well-established bond between baby and adoptive parents. To effectively assert an 'opportunity' interest, an unwed father must act early in proceedings on custody and adoption. [Citation omitted.]." 112 Idaho at 26.

Almost 20 years later, in *Doe v. Roe*, 142 Idaho 202, 127 P.3d 105 (2005), the Idaho Supreme Court again rejected an unwed natural father's assertion of his interest in his child because of his failure to establish his rights, either pursuant to statute or by timely establishment of a relationship. 142 Idaho at 206.

*Roe* involved a child born during the mother's marriage to a man other than the natural father. The mother and her husband were later divorced. During the divorce proceeding, the husband learned he was not the natural father of the child; he therefore filed an action to adopt the 4-year-old child and to terminate the parental rights of the natural father. At the mother's encouragement, the natural father took a paternity test, which established that he was the child's biological father. He then objected to termination of his rights, claiming he did not assert an interest earlier because he was unaware the child was his.

A magistrate judge determined that the absence of natural father's previous contact with the child was " 'legitimate' " and " 'for just cause, as [Father] believed the child was not his as he was repeatedly told so by [Mother].' " 142 Idaho at 205.

The Idaho Supreme Court reversed. The court relied upon its earlier analysis in *Steve B.D.* and determined the natural father's opportunity interest had passed ungrasped. *Roe*, 142 Idaho at 206-07. It noted that there was no dispute that the natural father had engaged in regular sexual contact with the mother within a couple of weeks of the estimated date of conception, that the mother told the natural father by telephone immediately after she found out she was pregnant, and that he was aware when the child was born.

At a minimum, therefore, the natural father was aware of the strong possibility of his biological link to the child. Despite this, he "did absolutely nothing to definitively determine whether the child was his, pay support for the child and assert his parental rights" for 4 years. 142 Idaho at 206.

Under similar rationales, several other courts have rejected fraud or deception as a substitute for showing that a parenting relationship had been established by an unwed father. *E.g., Matter of Juvenile Action No. JS-8490*, 179 Ariz. 102, 106, 876 P.2d 1137 (1994) (stating the requirement that an unwed father grasp his opportunity interest "includes investigating the possibility that the child might be his"); *Adoption of G.*, 529 A.2d 809 (Me. 1987) (even though biological father sent letter approximately 3 weeks after birth to judge in adoption proceeding, court determined best interests of child weighed in favor of allowing child to stay with adoptive parents); *State ex rel. T.A.B. v. Corrigan*, 600 S.W.2d 87, 91-92 (Mo. App. 1980) (holding mother had no obligation to reveal identity of father of illegitimate child placed for adoption where father had not asserted his paternity); *Matter of Child Whose First Name is Baby Girl*, 206 A.D.2d 932, 933, 615 N.Y.S.2d 800 (1994) (holding "the attempt by the father to measure the timeliness of his parental efforts from the date he contends he became aware of the existence of the child is not supported in law"); *Matter of Adoption of A.M.B.*, 514 N.W.2d 670, 673 (N.D. 1994) (mother's attempts to frustrate father's visitation with illegitimate child do not alone excuse the noncustodial parent from efforts to build a relationship with the child); *Hylland v. Doe*, 126 Or. App. 86, 93-94, 867 P.2d 551, *rev. denied* 318 Or. 478 (Or. 1994) (ruling that mother's concealment of newborn child's whereabouts did not excuse father of his obligation to timely assert his paternity in accordance with Oregon law); *Evans*, 303 S.C. 108 (birth mother's privacy interest in not revealing identity of biological father outweighs other interests; John Doe notice allowed).

Summarizing the rationale expressed in these cases, one commentator noted: "Blood gives the father the absolute first chance to perform the constitutional duties [of parenting]. If he fails, regardless of his blamelessness, the critical requirement of stability

for the .child precludes a second chance." Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson*, 45 Ohio St. L.J. 313, 368 (1984).

On the other hand, there are cases in which courts have ruled in putative fathers' favor. Generally, however, there was some circumstance that caused the interests to balance differently. For example, in some cases the adoption was not finalized or the adoptive parents were aware there were questions about the father's identity when they assumed custody or shortly thereafter. See, *e.g., In re Petition of Doe*, 159 Ill. 2d 347, 350-51, 638 N.E.2d 181, *cert. denied* 513 U.S. 994 (1994) (when assuming temporary custody prospective adoptive parents knew birth mother was refusing to disclose biological father's identity; and father's· identity, desire to parent, and refusal to consent was known 57 days later). Similarly, if the father made efforts to provide financial or emotional support or to protect his legal interests but the attempts were futile because of factors outside his control, the balance may shift. See, *e.g., Doe v. Queen*, 347 S.C. 4, 552 S.E.2d 761 (2001) (court order prevented father's contact with mother but father placed support payments in savings account); *Nale v. Robertson*, 871 S.W.2d 674 (Tenn. 1994) (father timely filed notice with putative· father registry but adoption agency did not learn of notice; adoptive· parents told of father's identity 3 months after child's birth). Rarely, however, have the mother's actions·alone been sufficient to shift the balance of interests to the point the court determined the State was not justified in ending the father's opportunity to assert his right to parent.

*Kansas Adoption Statutes*

With this discussion of cases in mind, we turn to the Kansas Adoption and Relinquishment Act, K.S.A. 59-2111 through K.S.A. 59-2144, and the specifics of this case.

The general rule of the Kansas Adoption and Relinquishment Act is that the consent or relinquishment of both known natural parents is required for an adoption. See K.S.A. 59-2129 (consent to adoption shall be given by living parents of child); K.S.A. 59-2124 (relinquishment of child to agency must be accompanied by form executed by both parents). Departure from this general rule

is permitted only if specific statutory requirements are met. See *In re Adoption of X.J.A.*, 284 Kan. 853, 881, 166 P.3d 396 (2007) (statutorily required consent prerequisite to district court jurisdiction to render valid adoption decree); *In re Adoption of Trent*, 229 Kan. 224, 228, 624 P.2d 443 (1981) (consent by the natural parents to adoption of their child is essential requisite to jurisdiction on part of court to render a valid decree of adoption; although invalidly acknowledged in Missouri before a Kansas notary public, where consent freely and voluntarily given and was executed in substantial compliance with statutory requirements, consent valid); *In re Marsolf*, 200 Kan. 128, 131-32, 434 P.2d 1010 (1967) ("It is well settled that the consent by the natural parents to the adoption of their child, where required by statute, is regarded as an essential requisite to jurisdiction on the part of the court to render a valid decree of adoption.") (citing *In re Thornton*, 184 Kan. 551, 337 P.2d 1027 [1959]; 2 Am. Jur. 2d, Adoption §§ 24, 70; 2 C.J.S., Adoption of Children §§ 18, 45c); *In re Sharp*, 197 Kan. 502, Syl. ¶ 2, 419 P.2d 812 (1966) (consent of natural parents required unless clearly proved facts warrant exception).

Here, N.T. relinquished custody to the adoption agency, but M.P. neither consented to the adoption nor relinquished custody. In such a case, K.S.A. 59-2136(e) requires a petition to terminate the father's parental rights.

Addressing the right to notice of the proceedings, the statute provides that "[i]n an effort to identify the father, the court shall determine by deposition, affidavit or hearing" if any man (1) is a presumed father under K.S.A. 38-1114, (2) has been determined the father by a court, (3) would be considered a father as to whom the child is a legitimate child under any state's laws, (4) has provided or has promised to provide support to the mother during the pregnancy or to the child after birth, (5) cohabitated with the mother at the time of conception or at birth, or (6) has formally or informally acknowledged or declared possible paternity. K.S.A. 59-2136(e).

These provisions, like the New York statutes considered in *Lehr*, place several mechanisms within a man's control which, if exercised, entitle him to notice of adoption proceedings. In addition,

these categories, like those in New York, are likely to cover responsible fathers who have stepped forward to assume parenting responsibilities.

There is no showing that any of these mechanisms was utilized by M.P., explaining why he bases his arguments on a constitutional, rather than statutory, right to notice.

*New York Procedures*

In addition to the Kansas procedures that were available to M.P., Kansas law grants full faith and credit to any proceedings or actions taken under the laws of another state. K.S.A. 38-1114(d). Hence, under the unique facts of this case, M.P. could have availed himself of legal protections available in New York—the state of his domicile, the location of the child's conception, N.T.'s location when M.P. first learned of the pregnancy, and the location to which N.T. promised to return. This means M.P. could have utilized the putative father registry as discussed in *Lehr*, 463 U.S. 248. See *Matter of Robert O.*, 80 N.Y.2d 254 (father who failed to, *inter alia*, register with putative father registry cannot vacate adoption even though unaware of child's birth). In addition, New York allows paternity proceedings to be "instituted during the pregnancy of the mother." 29A Judiciary, Family Court Act § 517 (McKinney 1999).

M.P.'s use of these procedures might not have guaranteed he would receive notice in Kansas. Yet, cases from other jurisdictions illustrate that a putative father may develop a liberty interest or at least strengthen his argument that he has a liberty interest by attempting to utilize the procedure of his home state even though the mother moved to another state.

For example, in *Pena v. Mattox*, 880 F. Supp. 567 (N.D. Ill. 1995), both the father and mother were residents of Illinois. The mother was taken to Indiana to give birth, and the child was placed for adoption in Indiana. The father did not know of the child's birth or the initiation of adoption proceedings. When he became aware of the adoption he brought an action for relief under 42 U.S.C. § 1983 and for other causes of action. The federal court granted the defendants' motion to dismiss, finding the father did

not have a liberty interest because he failed to seize opportunities to develop a relationship with his child. 880 F. Supp. 570-74.

In reaching this conclusion, the court concluded the fact the putative father "now may stand ready to accept the responsibilities of a father" was not a sufficient basis for the court to find a constitutionally protected liberty interest. 880 F. Supp. at 574. Instead, what was determinative was that the father failed to use the procedures of either Indiana or Illinois. The court noted the father could have brought a paternity action in Illinois, his home state, as soon as he was aware of the pregnancy and before the mother and her family prevented him from knowing about the child's location or adoption. In addition, he had several procedures available to him in Indiana, including a registry and paternity proceedings. 880 F. Supp. at 572-73.

Responding to the father's arguments regarding the procedural and substantive difficulties he would have faced if he pursued these procedures, the court stated:

> "It is important to note that this Court does not measure the constitutional interests present in this case by asking whether [the father] could have *successfully* established and protected his parental rights, however defined or limited. In the proper analysis, our focus is on the process established and available to [the father] to assert his rights in Illinois and Indiana, not on whether [he] could have succeeded in obtaining custody, visitation or any other rights of a parent." 880 F. Supp. at 573.

Ultimately, his failure to act promptly meant "he lost the wondrous opportunity and massive responsibilities of fatherhood." 880 F. Supp. at 574.

In a second case involving the procedures of multiple states, *Heidbreder v. Carton*, 645 N.W.2d 355 (Minn. 2002), the mother moved from Iowa—where the child was conceived—to Illinois and later Minnesota—where the child was born and placed for adoption. Although the mother maintained e-mail contact with the father, she did not tell him where she was and instructed her family and friends not to give him any information about her location. The father was aware of the pregnancy and had expressed his desire that the child not be placed for adoption. The mother had told him she would never do this. The father met with an attorney to discuss

visitation and child support, and the two of them discussed hiring a private investigator to find the mother. The father, however, took no steps to locate the mother. Nor did he initiate a paternity action or register with the Iowa Declaration of Paternity Registry.

In filling out the birth certificate information, the mother left blank the space for the father's name. Adoption proceedings were initiated, and the adoptive parents took the child home from the hospital. Thirty-one days after the child's birth, the natural father learned of the birth. Through a website, the father learned of the Minnesota Fathers' Adoption Registry and completed and mailed the necessary forms. The forms were postmarked 31 days after the birth; the law required fathers to register within 30 days of the birth. Alternatively, if a father filed a paternity action within 30 days of the child's birth and the action was still pending at the time of an adoption, he would gain rights in the adoption. The father in *Heidbreder* had not taken this step.

Because the father had failed to avail himself of the legal remedies in a timely fashion, the Minnesota Supreme Court held he was not entitled to notice of the adoption proceeding. 645 N.W.2d at 366-67, 369-70. Although the focus of the decision was on the father's failure to comply with Minnesota requirements, the court also noted that the father could have taken steps in his home state of Iowa to assert paternity. Exercising the option "would have put [the father] in a position to argue he established a sufficient commitment to warrant due process protections" even if there were procedural problems with fully prosecuting such an action in the mother's absence from the jurisdiction. 645 N.W.2d at 376. The court also discussed the impact of the Iowa registry. The court noted that if the father had registered in Iowa he would not have automatically been entitled to notice in the Minnesota proceeding but, like with the paternity action, it might have created a due process interest. Although the court did not decide the question because the father had not registered in Iowa, it stated: "If registration with an adoption registry in any state is, by itself, sufficient to demonstrate a substantial commitment to the child, then arguably a putative father is entitled to due process protection regard-

less of whether state law recognizes such registration." 645 N.W.2d at 376 n.16.

In contrast, where a father utilized the procedure of his home state, even though unsuccessfully, the court held he had established a liberty interest. In *In re M.N.M.*, 605 A.2d 921 (D.C. 1992), the mother hid the location of the child and the adoption proceeding from the natural father. One week after the child's birth, the father filed a paternity action which led to him deposing the natural mother and the child's natural grandfather (the mother's father) in a futile attempt to determine where the adoption proceeding was filed. Having a suspicion the proceeding was filed in the Washington, D.C., area, the natural father sent letters to judges in Maryland, Virginia, and the District of Columbia. Based upon these efforts and attempts to protect his legal rights, the court held the father had established a liberty interest. See 605 A.2d at 927-30.

*Finalization of A.A.T.'s Adoption*

In this case, M.P. did not utilize the legal procedures available to him in New York, nor did he pursue any procedures in Kansas, either during the first trimester of the pregnancy or later when he suspected that N.T. was still pregnant. Both states had established processes sufficient to protect his interest.

Having failed to protect himself, M.P.'s right to notice was contingent upon N.T. advising the court of sufficient information to result in actual notice. Instead of assuring M.P. received notice, N.T., by affidavit, provided a surname other than M.P.'s as the putative father and, as a result, M.P. was not identified as a possible father of the child.

Following the statutory procedure, the district court fulfilled its obligation to determine by affidavit the identity of the father. Neither the court nor the parties to the adoption—the adoption agency and the adoptive parents—had any way of knowing the affidavit or the information N.T. provided the GAL was false. Thus, to all concerned, a putative father was identified.

Once identified, the putative father is entitled to notice under K.S.A. 59-2136(e)(6) (notice be given to "every person identified

as a father or a possible father"); see also K.S.A. 59-2136(f). Notice is to be provided by certified mail "or in any manner the court may direct." K.S.A. 59-2136(f). Because an exact address for the identified father was not given by N.T., notice by publication was allowed.

The statute provides further:

"(g) If, after the inquiry, the court is unable to identify the father or any possible father and no person has appeared claiming to be the father and claiming custodial rights, the court shall enter an order terminating the unknown father's parental rights with reference to the child without regard to subsection (h). If any person identified as the father or possible father of the child fails to appear or, if appearing, fails to claim custodial rights, such person's parental rights with reference to the child shall be terminated without regard to subsection (h)." K.S.A. 59-2136(g).

In reliance upon this provision, after the court utilized the statutory procedures to identify the putative father, the adoption of A.A.T. was finalized based upon the court's and parties' belief that the father had been identified but had not appeared.

Under the statute, if a father does not appear, the father's rights shall be terminated and, thereby, the adoption can be finalized. By calling for the termination of parental rights, the provision brings finality to the adoption.

A different procedure applies if the mother identifies the putative father, notice is given, and the father enters an appearance in the adoption proceeding. If the father appears and asserts parental rights, several rights attach, including the right to appointed counsel and a hearing regarding whether paternal rights can be terminated. K.S.A. 59-2136(h) defines the criteria to be applied in the termination proceeding.

When applying K.S.A. 59-2136(h), Kansas appellate courts have strongly endorsed the parental preference doctrine, required strict compliance, and diligently enforced the clear and convincing evidence standard. See, *e.g., In re Adoption of X.J.A.*, 284 Kan. at 881; *In re Adoption of Baby Boy B.*, 254 Kan. 454, 456, 866 P.2d 1029 (1994); *In re Adoption of F.A.R.*, 242 Kan. 231, 747 P.2d 145 (1987); *In re Adoption of Trent*, 229 Kan. at 228; *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d 664, 667, 29 P.3d 466 (2001) *aff'd*

273 Kan. 71, 41 P.3d 287 (2002); *In re Adoption of Baby Boy S.,* 22 Kan. App. 2d 119, 912 P.2d 761, *rev. denied* 260 Kan. 929, *cert. denied* 519 U.S. 870 (1996); *In re K.D.O.*, 20 Kan. App. 2d 559, 889 P.2d 1158 (1995); *In re Baby Boy N.*, 19 Kan. App. 2d 574, 874 P.2d 680, *rev. denied* 255 Kan. 1001, *cert. denied* 513 U.S. 1018 (1994); *In re Lathrop*, 2 Kan. App. 2d 90, 575 P.2d 894 (1978).

Although M.P. makes it clear the provisions of K.S.A. 59-2136(h) are not at issue in this appeal, his arguments imply that Kansas' parental preference doctrine should be given weight even after the adoption is finalized. His position creates a tension with the rights of the adoptive family and the State because voiding the adoption would be in derogation of the matured rights of the State and the adoptive family. See K.S.A. 38-1111 (defining "parent and child relationship" as "the legal relationship existing between a child and the child's biological or adoptive parents."); see also *Smith v. Organization of Foster Families*, 431 U.S. 816, 844 n.51, 845-46, 53 L. Ed. 2d 14, 97 S. Ct. 2094 (1977) (noting adoption was the "legal equivalent of biological parenthood" and holding that "liberty interests may in some cases arise from positive-law sources" making it "appropriate to ascertain from state law the expectations and entitlements of the parties").

Undoubtedly, the human and emotional tensions of this case are enormous, creating sympathy for M.P.'s position and little doubt about the sincerity of his present desire for custody. Nevertheless, the critical fact remains that the opportunity to assert his interest in parenting slipped away without any involvement of the State. The interests of the State and the adoptive family justify a conclusion that M.P.'s opportunity to demonstrate his commitment to parenting passed without developing into a liberty interest.

We hold that M.P. did not have a liberty interest in a relationship with A.A.T. and that the State did not deny him the opportunity to establish such a relationship. Consequently, we affirm the district court's conclusion that the adoption is not void.

## Issue 2: Must the adoption be set aside because of fraud?

M.P.'s first alternative argument for setting aside the adoption decree is based on K.S.A. 60-260(b)(3), which provides that "fraud

(whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party" can justify relief from a judgment. Fraud entitling a party to relief from a judgment under K.S.A. 60-260(b)(3) must be committed by an adverse party.

Although the typical standard of review for a district court's application of the fraud rule under K.S.A. 60-260(b)(3) to a set of facts is abuse of discretion, see *In re Marriage of Hampshire*, 261 Kan. 854, 862, 934 P.2d 58 (1997); *In re Marriage of Reinhardt*, 38 Kan. App. 2d 60, 161 P.3d 235 (2007), we agree with M.P. that the question of whether N.T. was an "adverse party" involves statutory interpretation. This raises a preliminary question of law over which this court has de novo review. See *In re K.M.H.*, 285 Kan. 53, 79-80, 169 P.3d 1025 (2007), *cert. denied* 129 S. Ct. 36 (2008).

M.P.'s argument that the "adverse party" language is meant to relate only to "other misconduct" and not to "fraud" is not persuasive. When this court is asked to interpret a statute, we first attempt to give effect to the intent of the legislature as expressed through the language enacted. If a statute is plain and unambiguous, as we find this to be, this court will neither speculate regarding legislative intent nor read the statute to add something not readily found in it. There is no need to resort to statutory construction. "It is only if the statute's language or text is unclear or ambiguous that we move to the next analytical step, applying canons of construction or relying on legislative history construing the statute to effect the legislature's intent." 285 Kan. at 79 (citing *CPI Qualified Plan Consultants, Inc. v. Kansas Dept. of Human Resources*, 272 Kan. 1288, 1296, 38 P.3d 666 [2002]; *State v. Robinson*, 281 Kan. 538, 539-40, 132 P.3d 934 [2006]).

We see no ambiguity in the wording of K.S.A. 60-260(b)(3). It lists three ways in which relief from a court order may be obtained: fraud, misrepresentation, or other misconduct. Regardless of whether one reads the phrase "of an adverse party" to modify all three possibilities explicitly or only "other misconduct" explicitly, one ends up with the same interpretation. The legislature's choice of listing implies equality among the elements in the list. The plain meaning of the words bears this out. Fraud certainly qualifies as

misconduct; so does misrepresentation. "[O]ther misconduct of an adverse party" references the two other specifically stated types of misconduct. Its third position in the list also tells the reader that each of the three examples of misconduct in the list shares the modifying characteristic of the last, *i.e.*, that it must be the misconduct "of an adverse party."

We also note that the language of K.S.A. 60-260(b)(3) is identical to Rule 60(b) of the Federal Rules of Civil Procedure. Our interpretation is consistent with that of at least three federal circuit courts of appeals. See, *e.g.*, *Frederick v. Kirby Tankships*, 205 F.3d 1277, 1287 (11th Cir. 2000) (to obtain relief under federal rule, the losing party must prove the prevailing party obtained verdict through fraud, misrepresentation, or other misconduct); *Atkinson v. Prudential Property Co., Inc.*, 43 F.3d 367, 372-73 (8th Cir. 1994) (to prevail on motion to vacate judgment for fraud, movant must show, with clear and convincing evidence, that opposing party engaged in fraud or misrepresentation that prevented movant from fully and fairly presenting its case); *Varden v. Danek Medical, Inc.*, 58 Fed. Appx. 137, 139 (6th Cir. 2003) (unpublished opinion) (not entitled to relief under federal rule because plaintiff's attorneys, of whose actions he complained, were not "adverse parties" to the action and motions were filed more than 1 year after court's dismissal of judgment).

Adoptions are not perfectly analogous to the usual adversary proceedings in our courts. In this case, to the extent M.P. has an adverse party, that role is filled by the adoptive parents, who filed the petition for termination of M.P.'s parental rights. As noted above, the district court found that the adoptive parents and the adoption agency acted in good faith, and M.P. does not argue otherwise. N.T. had already voluntarily relinquished her parental rights and had surrendered custody of A.A.T. Under these circumstances, we affirm the district court's decision that N.T. did not qualify as an "adverse party" and that M.P. is not entitled to relief under K.S.A. 60-260(b)(3).

### Issue 3: Must the adoption be set aside because of the discovery of new evidence?

M.P.'s second alternative argument is that K.S.A. 60-260(b)(2) allows a court to relieve a party from a final judgment when there

is "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under K.S.A. 60-259." K.S.A. 60-259 requires a motion for new trial within 10 days. Ten days after the final adoption decree, M.P. had not been told by N.T. of A.A.T.'s birth or adoption. Under K.S.A. 60-260(b)(2), newly discovered evidence must be so material that its introduction would have been likely to produce a different result. Further, M.P. bears the burden of proof to show that newly discovered evidence of N.T.'s lies and his fatherhood could not have been discovered before trial through his exercise of due diligence. See *State v. Munyon*, 240 Kan. 53, 63, 726 P.2d 1333 (1986); *Plains Transport of Kansas, Inc. v. Baldwin*, 217 Kan. 2, 8, 535 P.2d 865 (1975).

Our standard of review on this issue is abuse of discretion. *In re Marriage of Hampshire*, 261 Kan. at 862.

The district court denied relief under K.S.A. 60-260(b)(2) because, it said, M.P. "should have taken action to verify whether [N.T.] had an abortion." M.P. asserts that "[t]here was little, if anything, M.P. could have done to discover N.T. had lied to him about the abortion . . . . While the district court in its decision stated M.P. had numerous 'red flags,' there was simply no reasonable way for M.P. to determine whether N.T. was lying to him."

Without addressing whether a party in M.P.'s position who did not participate in a proceeding can argue newly discovered evidence as a basis for relief from a judgment, we conclude the district court did not abuse its discretion in determining the natural father, by exercising reasonable diligence, could have discovered the natural mother's lie about obtaining an abortion and her concealment of the birth and adoption of their child. For example, M.P.'s explanation for not asking N.T.'s mother about the abortion was that he did not want to talk to someone who did not like him, which was what N.T. had reported in an effort to prevent the contact. Even though it may have been uncomfortable and awkward for M.P. to have talked to N.T.'s mother, he could have done so in an effort to verify or dispel his suspicions. Consequently, the evidence could have been discovered with minimal diligence, and M.P. is not entitled to relief from the judgment under K.S.A. 60-260(b)(2).

*Visitation*

Finally, we address M.P.'s recent motion for visitation pending resolution of this case. Based upon our ruling that M.P. has no continuing interest, the motion is denied as moot.

Affirmed.

JOHNSON, J., not participating.
HILL, J., assigned.

NUSS, J., dissenting: It is undisputed that when mother was 4 months pregnant, she intentionally lied when telling father that she had received an abortion. At the time of her fabrication, she was living in Kansas. Father was living and working 1500 miles away in New York, the place of conception. From the time mother first told this lie in January 2004 until the following Christmas Eve she continually repeated it. She testified that she lied because she knew that father would not consent to an adoption. In my view, any analysis of this case should start with this vital, uncontested fact: a year's worth of mother's abortion lies to father.

Also in my view, this starting analysis should simultaneously consider that since 1976 the law of the land has provided that, regardless of the desires of any father—including a husband—to preserve the mother's pregnancy, she alone has the right to decide whether to terminate it. See *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 69-71, 49 L. Ed. 2d 788, 96 S. Ct. 2831 (1976). As the United States Supreme Court explained, this exclusive right resides with the mother because "it is the woman who physically bears the child and who is the more directly and immediately affected by the pregnancy, [and thus] as between the two, the balance weighs in her favor." 428 U.S. at 71. Indeed, the exclusivity of the mother's right is emphasized by the Court's later holding that not even a married woman has any obligation to simply notify her husband of the fact of her abortion. See *Planned Parenthood*

*of Southeastern Pa. v. Casey*, 505 U.S. 833, 893-98, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992).

Obviously, there is no undoing an abortion. Nor would there appear to be any legal recourse to a father who desires to prevent or even delay the abortion, *e.g.*, through an injunction. See, *e.g.*, *Doe v. Smith*, 486 U.S. 1308, 100 L. Ed. 2d 909, 108 S. Ct. 2136 (1988) (unwed biological father prohibited from enjoining abortion of pregnant biological mother). As far as the law—and by necessity the father—are concerned, the abortion effectively ends the issue. Mother's announcement of her abortion essentially produces the same effect. By contrast, once a mother chooses not to abort, upon the child's birth the father has rights, *e.g.*, typically he must consent to any adoption. It is through this legal lens that this particular New York father's situation must be viewed.

The year of mother's abortion lies, when coupled with her absolute constitutional right to unilaterally abort, easily distinguishes the instant case from those upon which the majority relies. In short, this is not a case where a father simply happened to be unaware of a pregnancy, birth, or adoption of his child. Nor is it a case where the mother simply attempted to prevent a father from developing a relationship with his known child. Rather, it is a case in which the mother has expressly informed the father that the pregnancy and, consequently, the potential child with whom he could develop a constitutionally protected parental relationship have both been legally and irreversibly terminated.

In my view, the majority opinion wholly fails to consider the unique *Danforth*-based position from which this particular father starts. This failure greatly damages its analysis of the question, subject to our de novo review, of whether he sufficiently grasped the opportunity to be a parent and thus created a constitutionally protected interest. See *Lehr v. Robertson*, 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985 (1983). The magnitude of the failure is underscored by the undisputed facts disclosing that mother's absolute *Danforth* rights did not simply exist in a vacuum. Rather, while father disagreed with mother, he nevertheless fully respected and essentially felt bound by those rights and her resultant decision. Mother herself testified:

"Q. Had he ever asked you to have an abortion?

"A. We had talked about it.

"Q. Okay. Had he ever said that's what I want you to do?

"A. *He told me the decision was up to me.*

"Q. Okay. And that's what *his* testimony reflects, that he told you to do what you have to do. *But, he didn't want you to do it, did he?*

"A. *I don't believe he did.*" (Emphasis added.)

Accordingly, father's total respect for mother's rights caused him to start with a distinctive and sizable disadvantage in proving he grasped opportunities to become a constitutionally protected father. See *Lehr,* 463 U.S. 248.

There is clearly a threshold question to the inquiry of whether father adequately grasped such opportunities. More particularly, after mother's January 2004 lie to father about her abortion, did he even know, or reasonably should he have known, of her carrying the pregnancy to term? The majority appears to acknowledge the validity of the "reasonably should have known" threshold standard. 287 Kan. at 609 ("within a short time after he discovered or reasonably should have discovered that the biological mother was pregnant with his child"). If father reasonably could not have known, he cannot legitimately be expected to have grasped the numerous opportunities to be a father asserted by the majority, *e.g.,* paying mother's medical expenses during the balance of the pregnancy.

The California Supreme Court acknowledged this threshold in *Adoption of Michael H.,* 10 Cal. 4th 1043, 1054, 43 Cal. Rptr. 2d 445, 898 P.2d 891 (1995), *cert. denied sub nom. Mark K. v. John S.,* 516 U.S. 1176 (1996):

" 'A court should consider all factors relevant to that determination [father's full commitment to his parental responsibilities]. The father's conduct both before and after the child's birth must be considered. Once the father knows, *or reasonably should know of the pregnancy,* he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and the circumstances permit." (Emphasis added.) 10 Cal. 4th at 1054 (citing *Adoption of Kelsey S.,* 1 Cal. 4th 816, 4 Cal. Rptr. 2d 615, 823 P.2d 1216 [1992]).

Throughout the majority's opinion it contends that even after mother's lies, father reasonably should have known, *i.e.,* discovered, that mother continued her pregnancy. Indeed, it points to several findings of the trial court to this effect and to that court's

determinations that father should have taken action to verify whether mother aborted and "to protect his parental rights." There are several problems with this position, as will be thoroughly discussed later in the opinion. As a threshold matter, however, and most important, we must acknowledge that the trial court concluded that mother had committed fraud and that this determination has never been challenged, much less appealed.

Specifically, this father alleged fraud based upon, among other things, mother's continual abortion lies to him. He claims that these lies prevented him from acting—during the later months of pregnancy and the early months of his son's life—to demonstrate his desire to establish a parental relationship. The trial judge clearly agreed that fraud had been committed, ruling from the bench that "I . . . find that there's just blatant, direct fraud involved in this lawsuit." Similarly, the court stated as a "conclusion of law" in its journal entry that "[t]he fraud that was perpetrated in this matter was committed by [mother]." Indeed, the court only rejected fraud as a reason to relieve father from the judgment because mother was not an adverse party to the suit as is required under K.S.A. 60-260(b)(3). While mother's fraud could not serve as a basis for judgment relief for this limited reason, her fraud nevertheless remains a valid judicial determination.

Because of this finding and conclusion, which were not challenged at the trial level or appealed to this court, it is indisputable that all of the elements of fraud were present. See *Cooke v. Gillespie*, 285 Kan. 748, Syl. ¶ 2, 176 P.3d 144 (2008) (an issue not briefed is deemed waived or abandoned); *cf. Hill v. Farm Bureau*, 263 Kan. 703, 706, 952 P.2d 1286 (1998) (Litigant must object to inadequate findings of fact and conclusions of law in order to give the trial court opportunity to correct them. In absence of objection, omissions in findings will not be considered on appeal. Where there has been no such objection, the trial court is presumed to have found all facts necessary to support the judgment.). Among these fraud elements are an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive, upon which another party *justifiably relies* and acts to his or her detriment. *Alires v. McGehee*, 277 Kan. 398, 403, 83 P.3d 1191

(2004). See PIK Civ. 4th 127.40 (others *"reasonably relied* and acted upon" false representations and "sustained damage by relying upon them" [Emphasis added.]).

These trial court findings and conclusions appear to be at odds with its determination that father reasonably should have known of the continued pregnancy and taken action to protect his rights. Yet the majority opinion does not acknowledge, much less try to reconcile, them.

Nevertheless, in my view the following was conclusively established well before the parties appeared for oral arguments before this court: (1) father reasonably and justifiably relied upon mother's lies about her abortion; (2) in reliance upon mother's lies, father reasonably and justifiably failed to act, *i.e.,* to attempt to verify whether she aborted; and (3) because of father's reliance, mother's lies caused him damage, *i.e.,* his ability to establish more than a biological link with his son. See *Cooke,* 285 Kan. 748, Syl. ¶ 2; *Hill,* 263 Kan. at 706.

Even if this court were to *sua sponte* examine the fraud issue on appeal, fraud clearly exists. Fraud is a question of fact. *Nordstrom v. Miller,* 227 Kan. 59, 65, 605 P.2d 545 (1980). Because fraud must be proven by clear and convincing evidence, the trial court obviously believed that the truth of the fraud facts asserted was "highly probable." See *In re B.D.-Y.,* 286 Kan. 686, 695-97, 187 P.3d 594 (2008). On appeal, we consider whether, after review of all the evidence, viewed in the light most favorable to father, we are convinced that a rational factfinder could have found it highly probable, *i.e.,* by clear and convincing evidence, that mother had committed fraud against father and others. See *B.D.-Y.,* 286 Kan. at 705. Based upon the testimony of father and mother, I am so convinced.

If the presence of fraud under our particular facts, *e.g.,* the judicial determination of reasonable and justifiable reliance upon abortion lies which caused father damage, is not dispositive of the constitutional question, it certainly is an important part of the reasonableness calculus and therefore cannot be ignored. The abortion lies case of *Doe v. Queen,* 347 S.C. 4, 552 S.E.2d 761 (2001), is of substantial guidance. There, similar to the instant case, the

natural father and mother had a relationship in another state for about 4 months. In the third month of the relationship, mother informed father she was pregnant and wanted an abortion; father objected. The next month mother moved out and eventually settled in neighboring South Carolina. She later informed father that she had obtained an abortion in Atlanta. This was a lie; a child was born 7 months after she moved out.

Three months before the birth, mother had signed a criminal warrant against father. A consent order the following month prohibited him from going near mother for 1 year.

Because mother withheld father's address on the Consent for Adoption form, he was not notified of his child's birth for 2 months. For the 9-10 months between his notification and the contested adoption hearing, father prepared a nursery, arranged for medical insurance, and established a bank account for his son. He was unable to make financial contributions to his son or the proposed adoptive parents because they kept their identity a secret. Mother did access $200 from their joint bank account.

The trial court found that father's consent to adoption was required because of his compliance with the state statute requiring him to pay reasonable sums for the support of the child or for expenses incurred in connection with pregnancy or birth. The Court of Appeals reversed, finding father had failed to meet the literal requirements of the statute and the failure was not excusable under case law.

The South Carolina Supreme Court affirmed the trial court. It first addressed the consequences of the father's failure to act during the pregnancy, stating:

> "*Initially, we find [the father] should not be penalized for his actions, or lack thereof, prior to [the child's] birth.* Mother left their apartment when she was approximately 8-10 weeks pregnant, telling [the father] she intended to have an abortion. She thereafter lied, telling him she had, in fact, had an abortion in Atlanta. *She then made every attempt to conceal from [the father] the fact that she had not had an abortion, effectively isolating herself from him* and, through court orders, ensuring that [the father] could have no contact with her until well after the baby's birth." (Emphasis added.) 347 S.C. at 8-9.

Suggestive of our fraud requirements, the *Doe* court also rejected the Court of Appeals' insinuation that father's and mother's

appearances in the same courtroom—perhaps for the criminal matter—meant that he would know, or should have known, that she was pregnant because she was far enough along in her pregnancy to make her true condition apparent. It held this mere fact was patently insufficient, without more, to charge him with such knowledge. 347 S.C. at 9. This particular holding implied that father had reasonably relied upon mother's misrepresentations and acted reasonably in his efforts, or nonefforts, to discover the concealment.

The *Doe* court analogized the case to another where " 'an unwed father's ability to cultivate his opportunity interest in his child [was] thwarted by the refusal of the mother to accept the father's expressions of interest in and commitment to the child.' " 347 S.C. at 9. It ultimately ruled:

*"Given Mother's representations that she had obtained an abortion,* coupled with her extraordinary efforts to conceal her pregnancy from [father], we find the preponderance of the evidence amply demonstrates that [father's] *failure to support during the pregnancy was through no fault of his own* and, accordingly, we decline to require literal compliance with the statute." (Emphasis added.) 347 S.C. at 9.

After effectively finding that father should not have reasonably known of the continued pregnancy, the court then examined the consequences of his actions after actually learning of the birth. Here too it applied a reasonableness test and concluded his efforts were sufficient to excuse literal compliance with the state statute:

"Moreover, we find [father's] actions subsequent to learning of [child's birth] demonstrate 'sufficient prompt and good faith efforts *to assume parental responsibility.'*

"The family court found [father] had made sufficient efforts in that he had 'established a nursery, arranged for health insurance and began a savings account for the child.' We agree. While [father] conceded he had not paid support during the ten-month period prior to the hearing, he testified he was willing to do so, and would reimburse the adoptive parents for their expenses. Further, due to a February 1999 order preventing the disclosure of the identity of the adoptive parents, [father] was unaware of the name or identify of the Does, and/or their location. Under these circumstances, we simply cannot say that [father's] failure to support or visit [son] defeats his *constitutional interest in establishing a relationship with his son.*

. . . .

"Given the circumstances of this case, and the fact that the [adoptive parents] were unwilling to reveal their identity or whereabouts, we find [father] took *the only reasonable available alternative measures,* to wit, establishing a nursery, putting money in a bank account, and taking steps to provide for [the child] when he received custody." (Emphasis added.) 347 S.C. at 9-10.

Accordingly, the *Doe* court upheld the family court decision to deny the adoption; the custody of the then 3-year-old child was transferred to the father. 347 S.C. at 10.

Like *Doe,* the majority opinion admits that in the instant case, "once learning of his child's birth, the father immediately and diligently took action to assert his legal connection with the child." 287 Kan. at 614.

The *Doe* decision is of additional guidance because the South Carolina court also essentially applied the doctrine of "interference with" or "obstruction of" a father's efforts to parent. This is a doctrine well-established in Kansas law. Although research has not uncovered lies about abortion in our case law as in *Doe* and the instant case, there are numerous examples of applying the doctrine to efforts to terminate a resisting father's rights in an adoption context. See, *e.g., In re Adoption of Baby Boy B.,* 254 Kan. 454, 465, 866 P.2d 1029 (1994); *In re Adoption of F.A.R.,* 242 Kan. 231, 747 P.2d 145 (1987); *In re Adoption of Baby Boy S.,* 22 Kan. App. 2d 119, 129-30, 912 P.2d 761, *review denied* 260 Kan. 929, *cert. denied* 519 U.S. 870 (1996); *In re K.D.O.,* 20 Kan. App. 2d 559, 889 P.2d 1158 (1995); *In re Baby Boy N.,* 19 Kan. App. 2d 574, 585, 874 P.2d 680, *review denied* 255 Kan. 1001, *cert. denied* 513 U.S. 1018 (1994). In a number of these cases, the court has refused to allow an adoption and termination of the father's rights despite his limited, even absent, efforts because of mother's interference or obstruction.

Kansas case law appears to be devoid of situations like the instant case where the issue is whether the father has initially grasped enough opportunity to create a parental interest which would then give him a right to notice before severance of those rights under K.S.A. 59-2136(h). Nevertheless, our cases applying that statute have important application to the opportunity-grasping issue for several reasons. First, the interests in both instances are similar

and often overlap: (1) whether the father's interest is based upon more than a biological link and worthy of constitutional protection and, if so, (2) whether that established interest should nevertheless be terminated for later failing to perform like a father.

Second, the legislature's policy choices appearing in K.S.A. 59-2136(h) certainly can apply to the issue in the instant case. Toward that end, the Court of Appeals has recognized that "[t]hose instances specified under . . . K.S.A. 1993 Supp. 59-2136(h)(1)-(7) in which consent may be declared unnecessary *are examples of situations in which the right of a natural father is little more than biological.*" (Emphasis added.) *Baby Boy N.,* 19 Kan. App. 2d at 584. Perhaps to comply with that appellate court direction, when deciding that the father had no more than a biological link entitling him to no protection, the present trial court nevertheless concluded that he did not abandon the mother upon learning that she was pregnant or during her pregnancy. See K.S.A. 59-2136(h)(5).

The majority opinion fails to consider, or at least give appropriate weight to, this vital interference factor which is well known in Kansas adoption law, *e.g.,* mother's repeated abortion lies and other efforts to hide the truth. In my view, this failure to appropriately consider it in the reasonableness calculus represents yet another significant problem with the majority opinion. Amplification of some of the cases cited in Justice Beier's dissenting opinion therefore is warranted.

An excellent example of the interference doctrine's application in Kansas is this court's decision in *Baby Boy B.,* 254 Kan. 454. There, as in the instant case, an unwed mother consented to the adoption of her newborn child by a married couple; the father refused, instead wanting to raise the child. The adoptive parents sought to terminate his parental rights in the adoption petition on the ground that he had failed, without reasonable cause, to provide support for the mother during the 6 months prior to the child's birth pursuant to K.S.A. 59-2136(h)(4). Similar to the California Supreme Court's ruling in *Michael H.* discussed earlier, this court held that the test to be applied "is one of *reasonableness under all the relevant circumstances* existing in the case." (Emphasis added.) *Baby Boy B.,* 254 Kan. at 464.

Consistent with this test, we observed that the mother refused considerable assistance from the father, and therefore "[t]he district court properly considered her [natural mother's] refusal as a factor in determining if the father provided support to the mother." 254 Kan. at 465. We eventually upheld the trial court's denial of the adoptive parents' petition, *i.e.*, mother's refusal was a reasonable cause for the father not paying more support. 254 Kan. at 465-66.

In our earlier decision in *F.A.R.*, 242 Kan. 231, we did not address an adoption of a newborn. The decision is of guidance, however, because we addressed an area analogous to the instant case: an attempt to adopt and to sever a father's rights for his alleged failure or refusal " 'to assume the duties of a parent for two consecutive years.' K.S.A. 1986 Supp. 59-2102(a)(3) [predecessor to K.S.A. 59-2136(h)(7)]." 242 Kan. at 232. There, the trial court denied a stepfather's petition to adopt children of a prison inmate, finding that the stepfather failed to meet his burden of proof that consent was not required. Among other things, the trial court found that certain " 'actions by the mother constitute interference with the rights of the non-custodial parent to maintain contact with his sons.' " 242 Kan. at 234.

We held that the lower court was correct in so finding, and we necessarily implied it was correct in even considering this factor. 242 Kan. at 237. Foreshadowing our later decision in *Baby Boy B.*, we stated that "[i]n considering whether a nonconsenting parent has failed to assume his or her parental duties for two consecutive years, *all the surrounding circumstances* must be considered." (Emphasis added.) 242 Kan. at 236. Despite the absence of any language in this statutory subsection requiring reasonableness or reasonable cause, we nevertheless considered it relevant to examine whether the father made "reasonable attempts" to contact and maintain an ongoing relationship with his children. 242 Kan. at 236. We eventually upheld the trial court's denial of the stepfather's petition.

Similarly, in *K.D.O.*, 20 Kan. App. 2d 559, as in the instant case, an unwed mother consented to the adoption of her newborn child but relinquished her rights to a child placement service. The father

refused, instead wanting to raise the child. Within 2 weeks of birth, the service sought to terminate his parental rights on the ground that he had failed, without reasonable cause, to provide support for the mother during the 6 months prior to the child's birth pursuant to K.S.A. 59-2136(h)(4).

The Court of Appeals held that substantial competent evidence supported the trial court's denial of the petition to terminate the father's rights because of mother's interference with his ability to provide support. 20 Kan. App. 2d at 562. Although father only gave $100 during the pregnancy, he testified that he would support her and the baby; however, she refused all offers. In language reminiscent of the mother's attitude and behavior in the instant case, the *K.D.O.* mother testified, " 'I pretty much just shut him out and it was just myself and the social worker working toward that goal of getting through the pregnancy.' " 20 Kan. App. 2d at 561. Repeating the reasonableness and interference refrains, the Court of Appeals stated:

"Where a trial court finds that a father's *reasonable efforts* to provide support for the mother during the six months prior to the child's birth *have failed because of interference by the mother*, an adoption agency, or the adoptive parents, K.S.A. 59-2136(h)(4) should not operate to terminate his parental rights. [*Baby Boy N.,*] 19 Kan. App. 2d at 585." (Emphasis added.) *K.D.O.*, 20 Kan. App. 2d at 562.

In *Baby Boy N.*, 19 Kan. App. 2d 574, as in the instant case, an unwed mother consented to the adoption of her newborn child by a married couple; the father refused, instead wanting to raise the child. The adoptive parents sought to terminate his parental rights on the ground that he had failed, without reasonable cause, to provide prebirth support pursuant to K.S.A. 59-2136(h)(4). Quoting *In re Adoption of Baby Boy S.*, 16 Kan App. 2d 311, 313, 822 P.2d 76 (1991), the Court of Appeals acknowledged that the determination under this statutory subsection was

" 'analogous to cases where the trial court must determine if a parent has failed or refused to assume the duties of a parent for two consecutive years prior to an adoption pursuant to . . . 59-2136(h)(7) . . . [and that] [t]he tests and rules applicable in those instances are equally applicable [here].' " 19 Kan. App. 2d at 587.

Echoing the Supreme Court decisions in *F.A.R.* and *Baby Boy B.*, it reiterated that when making either determination, "all the relevant surrounding circumstances must be considered." *Baby Boy N.*, 19 Kan. App. 2d at 587; see also *Baby Boy S.*, 22 Kan. App. 2d at 129-30 (same).

In summary, the analysis should begin by viewing mother's year's worth of abortion lies through the *Danforth* lens: an acknowledgment that not even a married woman has an obligation to notify her husband of the fact of her abortion; much less does an unmarried woman have an obligation to obtain the consent of the father before aborting. As reflected in this unwed mother's own testimony, while father disagreed with her, he nevertheless fully respected and essentially felt bound by mother's *Danforth*-based rights and her resultant decision to abort.

The analysis should proceed with a consideration of whether father reasonably should have known of the continued pregnancy based upon all relevant surrounding circumstances, including not only mother's abortion lies to him but also her other efforts to conceal or otherwise obstruct and interfere. A similar standard of reasonable efforts under all the relevant circumstances should apply to father's efforts once he learned of the birth.

The adoptive parents' failure to challenge at the trial court level, much less appeal, that court's fraud findings and conclusions conclusively establishes that father reasonably and justifiably relied upon mother's lies about her abortion; that in reliance upon mother's lies, father reasonably and justifiably failed to act, *i.e.*, to attempt to verify whether she aborted; and that because of father's reliance, mother's lies caused him damage, *i.e.*, his ability to establish more than a biological link with his son. The *Doe* court characterized the ability to form more than a biological link as a constitutional interest. 347 S.C. at 10.

Assuming that reasonable reliance and resultant damage is not conclusively established by the failure to challenge or appeal, then as Justice Beier discusses, the evidence of record demonstrates the father made considerable efforts that were reasonable when considering all the circumstances. As she mentions, determination of whether the evidence is sufficient to establish his rights of father-

hood is a question of law that we review de novo. Most of the relevant facts have been well chronicled by other separate opinions and need not be repeated here. Several additions are important, however, as they further support the conclusion that father has done "enough" to prove more than a biological link. In providing the additions, we will also examine the majority's interpretation of *Lehr*.

### Mother's deception of others.

The majority opinion criticizes father for not grasping numerous opportunities to develop a parental relationship, particularly in failing to take the steps necessary to catch mother in her abortion lies. The majority then suggests a number of missed opportunities, *i.e.*, steps available to him. Its analysis, however, fails to fully consider that mother was such a good liar she was able to deceive absolutely everyone.

Mother fooled members of her immediate family. Specifically, during the last 7 months of mother's pregnancy, she lived with her mother (for ease of reference, "grandmother"), stepfather, and sister. According to mother's own testimony, when her baby was born, she lied to grandmother, her sisters and stepfather at the hospital, telling them that the baby had died in childbirth. Again according to mother's testimony, because grandmother and some other family members had actually seen the live child, mother had to lie again. She told them that the baby had later died. She testified further that the family, even those with whom she lived, apparently did not attempt to conduct any verification:

"Q. Did they question that?
"A. Yeah.
"Q. You've got a seemingly healthy newborn and then you say, well, he died.
"A. Yes, that's what I said. *And if I didn't give them any more answers to their questions, they just left it alone.*" (Emphasis added.)

Father testified similarly. Grandmother told him that after birth, she bought baby clothes and accessories and went to the hospital room. There, she saw the adoptive parents. Each side wondered who the other was: "What's going on here?" The nurse then rushed

grandmother out of the room. Later mother called grandmother and said the baby had died. But grandmother had doubts:

"And [grand]mother said, well, I seen that baby. I raised babies . . . . That was a healthy baby. I know a healthy baby when I see one. He wasn't sickly at all. *Something's wrong.* And [mother] called her sister and said the same thing, that the baby died. [Mother] had told the church and her minister that the baby had died. *Everybody thought the baby had died for a while.*" (Emphasis added.)

After these additional lies, obviously mother did not tell grandmother of the baby's immediate adoption. Not only did mother testify that the family just "left it alone," but also the record is devoid of any other evidence suggesting that her family or church members, who lived in the same town as mother, attempted to ascertain her veracity on any of these occasions.

In addition to deceiving members of her close family and church with her lies, mother was obviously successful in deceiving the lawyer appointed to represent the father's interests at the original adoption proceeding. In reliance upon mother's lies, the lawyer repeated the deceits in her own affidavit filed with the court. Mother not only deceived this attorney and the adoption services agency, but she also deceived the adoptive parents and their lawyers. There is no evidence that any of these people attempted to ascertain mother's veracity. Yet inherent in the trial court's unchallenged finding of mother's fraud is a finding that they all reasonably relied upon her lies and reasonably failed to act as a result. Mother's lies also ultimately deceived the trial court judge who initially granted the adoption.

It may be argued that, unlike these numerous people, father had suspicions which are contained in the record. A closer look at this evidence, however—his purported express suspicions and his conduct implying he harbored suspicions—reveals they were not truly suspicions.

Father's alleged suspicions.

Father testified he did not undertake any independent efforts to determine the truth or falsity of what mother was telling him about the abortion because "I didn't question it." He further testified that he was never aware of any prior dishonesty in their relation-

ship. She hid her continued pregnancy; according to him, she talked on the phone as if nothing happened. He testified that even when she called the day after the baby was born, there was no evidence at all that would alert him to a birth. He also testified, and mother confirmed during her testimony, that she repeatedly and consistently told him that she was fine and would be returning to him in New York City "in the very near future."

As for the suspicions father purportedly expressed to mother, he explained them in his deposition, which was later read at trial:

"Q. Were you . . . suspicious about whether or not she was telling you the truth [about the abortion]?

"A. It was—it was—I mean, don't think I'm a type of witch doctor here, all right? But it's like I was sleeping, and when I asked my grandfather—my mother is like, why are you sleeping so much? You got somebody pregnant? And I'm saying to myself, like, I *had* somebody pregnant, you know, but never telling them, like, yeah, I *had* somebody pregnant. So I'm thinking, like, why is everybody that's older asking me, you know, why are you sleeping? Why are you gaining weight? Why you—I'm thinking, like, these are all things they say men go through when they get somebody pregnant. *So every time somebody would ask me, I'd be like, [Mother], are you sure you're not pregnant? Because I'm—it was that type of conversation. You sure you're not pregnant, [Mother]? Because I'm gaining ten pounds. Or [Mother], you sure you're not pregnant because I'm sleeping all the time, always lazy. It had nothing to do with, like, I think she's pregnant.* Because if I thought that she *was* pregnant, then I probably would have gotten an investigator to come out here and seen and try to find her. But, I mean, if I—*I could only believe what she told me. If she told me—if she told me that she had the abortion and she wasn't pregnant and she was coming up here [to New York] to see me, that's a throw-off fact. Well, she can't [still] be pregnant if she's saying she's coming up here to see me. That's the furthest thing from my mind.* I just want to see her." (Emphasis added.).

Adoptive parents' counsel then pointed out to the father that despite mother's repeated assurances about coming back to New York from Kansas, she never did:

"Q. Yeah, but she never came.

"A. Exactly.

. . . .

"Q. Excuse me. Month after month after month after month after month she put you off.

"A. Uh-huh.

"Q. Would say, I'm coming home. I'm coming home for St. Patty's Day. I'm coming home for Easter.

"A. Uh-huh.

"Q. And she didn't come.

"A. Exactly.

"Q. *And didn't that make you the least bit suspicious about what she was up to?*

"A. *No.* I didn't think that anybody would have been pregnant by me or anybody and not tell them that they was pregnant. That's the furthest thing from my mind, that this woman is carrying my child." (Emphasis added.)

Adoptive parents' counsel persisted with the suspicion line of inquiry in his deposition. Father returned to his earlier explanation:

"Q. . . . And was there a little voice inside of you that was saying, I think she might be trying to hide a lie?

"A. I gained 10—I was coming in at 200 pounds. I'm 230 now.

"Q. Is that a yes or a no?

. . . .

"A. *The only reason why I asked [mother], was she pregnant, any time I asked her,* because I would ask my grandfather, for example, Pop, you got anything for fatigue, because I'm tired, you know. My grandfather does this tea stuff where you put tea in vinegar and drink this, it will give you a burst of energy. Right? And he like, boy, it seem like you're making bones. And I ask him, what is making bones? He says, well, somebody's pregnant. *And this is them telling me somebody's pregnant. You know?"* (Emphasis added.)

Father then testified that he truly wanted to forget about the whole abortion situation and explained why:

"A. . . . *Quite honestly, I wanted to forget about the whole—the whole abortion situation.* I wanted forget—I wanted to forget about that, so I wasn't constantly every time I speak to her, are you pregnant, are you pregnant? You're telling me you're not, you're pregnant, you're pregnant. I wouldn't do that. My grandmother passed away. I felt like the abortion was a punishment from God for her leaving me. *So I wouldn't have never—I was trying to stay away from that subject. I felt like I was being punished for having the abortion. So God came down and took grandma.*

"Q. When did you lose your grandmother?

"A. In April [2004]." (Emphasis added.)

The death of father's grandmother, and the feeling he had for why she had died, was also his explanation for what little, if any, communication he had with mother in May and June.

"I kinda strayed away from her [mother], because my grandmother passed away, and like I said, I thought I was being punished for having abortion, and I didn't

want to speak to the person that I was being punished *for*, so I thought the best thing for me to do was just stay away from her until I could be able to handle my situation." (Emphasis added.)

As for the suspicions purportedly evidenced by father's purchase of earrings in December 2004 for the daughter he told his friend that he "knew" he had, the full explanation is contained in the following deposition testimony:

"Q. . . . . The question was whether you ever bought any baby clothes I assume in anticipation of having a baby girl. . . .

"A. I bought—let me put this on the record. I bought two earrings, a set of earrings, thinking that I had a daughter. Well, just keep saying I had a daughter. Told it to my best friend. His name is [D.T.]. And [D.T.] looked at me and said, you don't have no kids, man. This was on Christmas—this is on Christmas Eve. I bought a set. Most people buy one earring. I bought a set. And I made a comment, like, well, *when I have a daughter, I'm going to take both these out, put them in her ear, so it won't be—it's not like I'm wasting money.*

"Q. And that would have been Christmas of what year?

"A. That's just this past Christmas.

"Q. 2004.

"A Yeah.

"Q. So it is fair to say you had some intuition, something internal was going on that didn't feel right about what [mother] was telling you or doing?

"A. I don't know—I don't know if it was what she was telling me, but I was—I was constantly—I was—I was sad, thinking that I had had that—that she had an abortion, and I was dealing with that. And I also was on—I just—*I don't know if—if that was my way of grieving, saying like I had a daughter, I could have had a daughter.* I mean, because when you tell a person—when you tell a person that don't have no kids—I'm—at the time I'm 35 years old. What am I having abortions for? I'm not young. I hadn't got raped. So what am I—what am I having abortions for? You know. Then you have somebody that—like I stated earlier, that you don't argue with, so why not? *So yeah, I was going through something. I was going through something to the fact, well, I was hoping that I had a kid, but thinking that she gave up the kid,* and still couldn't go at her the way I wanted to go at her, because *I'm figuring well, she's grieving like I'm grieving, because I know what I was feeling.*

"Q. I'm not sure I understand that response at all. *When you're talking about her grieving, are you talking about her grieving as a result of placing the child for adoption?*

"A. *No.*

"Q. You're talking about—

"A. *For her having abortion.* I never knew—I never knew about no adoption. I never knew about adoptions. I never knew that she was still pregnant. I never knew she gave the baby up for adoption." (Emphasis added.)

Father's trial testimony was consistent with the "someday a daughter" deposition testimony:

"Q. And your testimony today is that you were buying these earrings in anticipation of a daughter being born some day?

"A. But I also said in the deposition *when I get a daughter.* I mean—

"Q. You also told it to your best friend that you were getting these for a daughter and he said you don't have no kids, man?

"A. Exactly." (Emphasis added.)

Finally, the purported evidence of "his suspicions" should be analyzed with his testimony of his reaction when the mother eventually told him the truth—that he was a father:

"December 24, the night she [mother] called me. . . . It wasn't about our child. It was about [M., the father of her other child, N.] and [mother.] In that conversation she was telling me when [M.] got mad at her, he wouldn't pay attention to [N.].

. . . .

" . . . I said if [N.] was my child you wouldn't have to worry about that.

"And I went into this big thing about how *if I had a child* how I would act towards my child, and I heard her crying in the background and I said what's wrong. *And I thought at the time that she started to cry that I was sparking—opening up old wounds like maybe she's depressed about the abortion,* and I said, I'm sorry, I'm sorry, and she said, no, no, don't be sorry. I was, like, you understand what I'm saying, [mother]? I kept going on. And she was like you got a child and I like you have a child—I have a child and she said, yeah, you have a child. And she still was crying so she was trying to work through the emotions of crying, *and I just was in shock.* And I think she was still on the phone. I ran upstairs and told my mother. I was like I got a child and my mother looked at me almost like boy, get out of my room, two o'clock in the morning you talking about you got a child.

"And I ran back downstairs and picked up the phone and I said well, what did I have? And then I thought, I was like well, what did I have and then she stated a boy. And I was, like, where are you, . . . how do I get to you, where are you at? She kept crying and crying. . . . [A]nd she was, like, wait a minute, . . . I gave him up for adoption. I said, why would you do that? So in the likes of me being happy about the situation, it was more like a downfall." (Emphasis added.)

### Father's failure to physically check in Kansas.

The majority also appears to criticize father for failing to ascertain mother's veracity by physically checking on her in Kansas. As

mentioned above, he testified that he did not try to locate her in Kansas because she kept saying she was coming "home." According to him, "Every holiday that came about . . . [she would say] I'm going to come up . . . [and] she would like lead me to think that she was coming, she was coming, she was coming, she was coming. Never seen her. Now I know why."

Father testified that even after she told him that she had received the abortion, "We still was on the phone, and she still said she was going to come back next month every month. I offered to buy her a plane ticket if that was the problem." Mother confirmed this fact, testifying, "He asked me when I was going to see a doctor, and I told him when I get back. That was my answer for everything, when I get back [to New York]." On being asked whether he ever asked her for the name of her OB/GYN doctor in Kansas, she responded, "I was planning on going back to New York, so why would I have an OB/GYN here?"

The Kansas house phone number.

The majority also criticizes the father for failing to follow up regarding the Kansas house phone number. Mother testified that she felt safe in maintaining her deception when on December 5, 2003, she gave father the phone number of the house where she lived with family members because no one would answer the phone except her: her stepfather never answered the phone, grandmother worked third shift and slept all day, and the sister was in school. According to mother, "he never would have talked to anybody but [me]." She testified that although he would ask if he could speak with grandmother or stepfather, she would tell him "no." Moreover, he testified mother told him that grandmother did not like him, so "I'm not going to call [grand]mother's house if she doesn't like me." As a result, mother also told him to call at times when grandmother was not even at home. Accordingly, while the majority cites mother's testimony that grandmother would have told father about mother's carrying the pregnancy to term if he had simply asked, the "reasonable efforts" analysis should consider that mother took many steps to prevent the two from communicating so father could not ask if he desired to. See, e.g., *In re Adoption*

*of Baby Boy B.*, 254 Kan. 454, 464, 866 P.2d 1029 (1994); *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987); *Adoption of Michael H.*, 10 Cal. 4th 1043, 1054, 43 Cal. Rptr. 2d 445, 898 P.2d 891 (1995), *cert. denied sub nom. Mark K. v. John S.*, 516 U.S. 1176 (1996) (once father knows, or reasonably should know, of the pregnancy).

### Other father efforts to parent/support.

The majority also criticizes father for failing to grasp numerous opportunities because he failed to provide much, if any, financial support to mother. Mother testified, however, that she never wanted anything from father; she simply wanted this chapter in her life to close. Accordingly, she never requested that he help with expenses or medical bills. She testified that whenever she did ask father for something, he would always do it. For example, he gave her money during her pregnancy before she left New York. When she told him she needed money to return to New York the month after the alleged abortion, he sent her $200. She also told father that she had her own insurance, *i.e.*, to cover medical expenses of pregnancy and birth and that "cost wouldn't be a problem." See, *e.g.*, *In re K.D.O.*, 20 Kan. App. 2d 559, 889 P.2d 1158 (1995) (although father only provided $100 during the pregnancy, mother refused all offers; court held mother interfered with his ability to provide support).

### Relationship harmony.

In my view, none of the separate opinions sufficiently consider the delicate situation created between a man and a woman when the woman, especially one who is unwed, becomes pregnant, nor do they sufficiently consider the resultant sensitivity required. As the Supreme Court suggested on the general subject of abortion in *Roe v. Wade*, 410 U.S. 113, 153, 35 L. Ed. 2d 147, 93 S. Ct. 705, *reh. denied* 410 U.S. 959 (1973):

"Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved."

The Supreme Court also acknowledged the delicacy of the pregnancy issue in the marital context in *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 69-70, 49 L. Ed. 2d 788, 96 S. Ct. 2831 (1976):

"We are not unaware of the deep and proper concern and interest that a devoted and protective husband has in his wife's pregnancy and in the growth and development of the fetus she is carrying. . . . Moreover, we recognize that the decision whether to undergo or to forego an abortion may have profound effects on the future of any marriage, effects that are both physical and mental, and possibly deleterious."

And as mentioned previously, by law the decision whether to terminate the pregnancy is exclusively the mother's. "The Court has held that 'when the wife and the husband disagree on this decision, the view of only one of the two marriage partners [the mother's] can prevail.'" *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 896, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992) (citing *Danforth*, 428 U.S. at 71).

In my view, the sensitivity required by the father is not only an important factor, but also one that must be kept at the forefront. One must consider whether legitimate efforts of the father, designed to ascertain the unwed pregnant woman's veracity, are nevertheless construed by her as serious assaults on her integrity. When a mother becomes aware of a father's efforts to ascertain her veracity—whether calling the grandmother or the sister, as the majority suggests, or hiring a detective or coming to Kansas himself—those efforts can backfire. They can tip what already may be a precarious balance into the mother's unappealable decision to now obtain an abortion because she considers the father's efforts to be interfering with her unilateral right to abort. A mother might also realistically view the father's actions as stalking and a danger to her physically. Although the exact reasons are not provided, in *Doe v. Queen*, 347 S.C. 4, 552 S.E.2d 761 (2001), the pregnant unwed mother signed a criminal warrant against the father with whom she was no longer living and obtained a consent order to prohibit him from going near her for 1 year.

And even assuming no word of the father's veracity checks gets back to the mother, or if it does and she nevertheless elects to

remain pregnant, will the father be required to monitor mother's activities for the remainder of the pregnancy "just in case" she changes her mind? And even assuming the mother has not been driven away by father's actions, how may his actions affect the chances for eventually establishing a good relationship with her for the benefit of the couple and also the child?

These concerns are not theoretical. Based upon mother's testimony, they were proven real in the instant case. According to her, for a period in May and June of 2004, she terminated telephone contact with father because she felt he questioned whether she was still pregnant after she had informed him months earlier of the abortion. Mother testified that she did not permit the communication to resume until June 25, when her only reason for then calling was to inform father that she had given birth to his son the day before. Once on the phone, however, she could not bring herself to tell him the truth. She testified that although grieving, she told him she was doing fine.

*Lehr*

The majority relies upon the dissenting opinion in *Lehr v. Robertson,* 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985 (1983), to detail facts indicating mother's obstruction or interference with the biological father's rights. It then points to the interference in the instant case. The majority appears to suggest that the *Lehr* interfering facts did not prevent that court from ruling against the father and, as a result, the interfering facts in the instant case cannot protect the father here. I disagree.

First, to the extent the *Lehr* dissent's position could be characterized as promoting an obstructionist-based argument—"but for the actions of the child's mother there would have been the kind of significant relationship that the majority concedes is entitled to the full panoply of procedural due process protections" (463 U.S. at 271 [White, J. dissenting])—it is important to realize that this was not an argument identified by the father in his two appellate briefs or even developed as one at oral arguments. The closest the *Lehr* majority opinion may be said to acknowledge a possible obstructionist argument and supportive facts is contained in its foot-

note 23 at 265. There, it stated: "There is no suggestion in the record that appellee engaged in fraudulent practices that led appellant not to protect his rights." As a result, the *Lehr* dissent's "obstructionist" facts and arguments clearly had no bearing on the majority's opinion. Indeed, the majority does not even acknowledge that there is a dissent. The majority simply held that father's failure to register with the state putative father registration was all that was needed to decide the issue in the case, *i.e.*, "whether New York has adequately protected his opportunity to form such a [developed] relationship [with his child.]." 463 U.S. at 262-63.

Second, even to assume that the "obstructionist" argument had been raised and rejected by the *Lehr* majority, it still does not affect this father's rights because of the presence of fraud in the instant case. The *Lehr* majority's statement—"no suggestion in the record that appellee engaged in fraudulent practices that led appellant not to protect his rights"—suggests that a fraud allegation would have affected the case's outcome, or at least would have been considered. Unlike *Lehr*, fraud was not only alleged in the instant case, but it was also expressly found by the trial court. Moreover, the fraud found was precisely the type identified in *Lehr*, *i.e,* a mother's fraud "that led [father] not to protect his rights." As discussed earlier, an unwed pregnant woman telling a man that she—pursuant to her exclusive constitutional right to so decide—has just terminated the pregnancy would, in his eyes and in the eyes of the law, effectively terminate any rights he might have had as a prospective father. Pursuant to Kansas fraud law, that lie would reasonably lead the father to believe he had no recourse. See *Danforth*, 428 U.S. 52; *Doe v. Smith*, 486 U.S. 1308, 100 L. Ed. 2d 909, 108 S. Ct. 2136 (1988).

The majority also points to the putative father registry in *Lehr* as being available in the instant case because coincidentally both fathers lived in New York. The mother's fraud here would have made that registration futile. Father undoubtedly would have registered under his true name. The mother's lies would have resulted in the Kansas court—similar to creating its faulty newspaper notice—sending a different name to the New York registry for eventual

notification of all men in that state with that name. It is extremely doubtful the natural father would have been notified.

The majority opinion suggests that even if registering in New York were ineffective, it at least would demonstrate that the father took action signifying his desire to grasp opportunities to establish a relationship. Because Kansas has no such registry, we have no history telling us when such a registration should have occurred in the instant case. When this particular man and woman are in a relationship, and she becomes pregnant, does he file as soon as he learns of the pregnancy in order to protect his rights? Or does he wait—and file when she leaves New York to visit Kansas relatives because, despite her assurances to return, she may not? Or does he wait until a certain amount of time passes and she has still not returned? Or does he wait until she tells him the pregnancy has been aborted, and he should nevertheless disbelieve her? Or does he wait until sometime afterward—when it becomes clear she is probably not returning to New York and he cannot see for himself if she is still pregnant? And as mentioned, what deleterious effect upon her decision on whether to abort and upon their relationship does her eventual knowledge of such a registration have? A registration essentially says: "Mother, I don't trust you to tell the truth so I'm filing to protect my rights."

The same questions and concerns arise about another effort the majority appears to suggest could be taken by the father: filing a paternity action. When does he file, and what message does he send the mother when he does? More particular to this option, should he file even after she tells him she has had an abortion at 4 months? Or would such a legal action be moot, in bad faith, or both? And if she is still pregnant when she files her answer to the petition, will a judge allow him to keep it on file until her due date—just in case she may decide to keep the baby instead of abort? Unlike the majority's statement regarding a New York statute (287 Kan. 620-21), Kansas law does not appear to allow the filing of a paternity action before birth. So at what later point does he file?

In any event, I readily conclude as a matter of law that the father in the instant case already took enough reasonable steps to establish

his constitutionally protected parental relationship with his child. There was no notice given before the State took his liberty interest. Accordingly, relief from the judgment should be granted under K.S.A. 60-260(b)(4); the judgment is void because it was granted in a manner inconsistent with due process. *See Automatic Feeder Co. v. Tobey,* 221 Kan. 17, 21, 558 P.2d 101 (1976).

If necessary, father should also be granted relief under K.S.A. 60-260(b)(2), *i.e.*, newly discovered evidence. The majority rejects this position, concluding that "the district court did not abuse its discretion in determining the natural father, by exercising *reasonable* diligence, could have discovered the natural mother's lies about obtaining an abortion and her concealment and adoption of their child." (Emphasis added.) 287 Kan. at 629. It concludes that "the evidence could have been discovered with *minimal* diligence." (Emphasis added.) 287 Kan. at 629.

The primary problem with the majority holding on this issue was addressed in the preceding discussion about the judgment being void under subsection (b)(4) of K.S.A. 60-260. Specifically, it is unchallenged that the trial court found fraud. That determination requires clear and convincing evidence, *i.e.*, that the existence of the fraud elements were found to be "highly probable." *In re B.D.-Y.*, 286 Kan. 686, 695-97, 705, 187 P.3d 594 (2008). Necessarily contained within that unchallenged finding is a determination that the father "reasonably" relied upon the "natural mother's lies about obtaining an abortion and her concealment and adoption of their child." Yet the trial court denied relief under 60-260(b)(2) because father "should have taken action to verify whether [mother] had an abortion."

I remain puzzled about how a trial court can find it highly probable that father reasonably relied upon abortion lies to his detriment but then find that father should have discovered those lies with reasonable diligence (*State v. Lora,* 213 Kan. 184, 194, 515 P.2d 1086 [1973]) or due diligence (K.S.A. 60-260[b][2]). A fortiori, I question how the majority opinion can then conclude that the lies could have been discovered with "minimal" diligence.

We have held that despite an abuse of discretion standard, " '[q]uestions of law are presented when an appellate court seeks

to review the factors and considerations forming a district court's discretionary decision.' " *State v. White,* 279 Kan. 326, 332, 109 P.3d 1199 (2005) (quoting *Kuhn v. Sandoz Pharmaceuticals Corp.,* 270 Kan. 443, 456, 14 P.3d 1170 (2000). In *White,* we also quoted *Koon v. United States,* 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996), which stated: " 'A district court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.' " By the same rationale, here the trial court failed to consider its own ruling on fraud when it denied relief under the newly discovered evidence standard in K.S.A. 60-260(b)(2). Accordingly, at a minimum the matter should be remanded for its consideration and reconciliation.

Remand is unnecessary for this consideration under K.S.A. 60-260(b)(2), however, because, as discussed in the earlier analysis under K.S.A. 60-260(b)(4), father had a constitutionally protected interest that was taken from him in a manner inconsistent with due process. Accordingly, that particular judgment declaring that he had no interest and approving the adoption is void.

I would reverse the judgment of the trial court and remand for further proceedings not inconsistent with this opinion.

BEIER, J., dissenting: I respectfully dissent from the majority's ruling on the issue of whether the adoption decree may be void and, thus, from the majority's result in this case.

First, I do not view my differences from the majority as arising out of a disagreement over facts or, more specifically, over factual findings of the district court judge. Although it is a fact that M.P. was suspicious, it is not a fact that he should have known N.T. was still pregnant and gave birth to his child. N.T. did everything in her power short of muzzling her mother to prevent M.P. from knowing the true state of affairs until A.A.T. was 6 months old. M.P. may have been less than perfect, but a ruling on whether he ever had parental rights worthy of protection cannot turn on his lack of clairvoyance.

Second, I cannot help but observe that the majority's decision builds a bias into the law that will favor the wealthy or well-fi-

nanced. The majority says it agrees with the district court that M.P. took "no action" to protect his parental rights, that acting on his suspicions "would have required little effort," and that he could have determined where N.T. was and learned of her continued pregnancy. See 287 Kan. at 600. The undisputed facts, however, demonstrate that M.P. sent N.T. a small amount of money, that he persisted in questioning her, and that he promptly and doggedly pursued access to and a relationship with his child as soon as he learned of N.T.'s multiple lies. I do not accept that the United States Constitution or the adoption law of Kansas require him to hire a private investigator, as was suggested at oral argument, or to incur the expense to come to Kansas personally to challenge N.T.'s story. Although the record indicates that this particular natural father may have had the resources to undertake such efforts, surely that will not be true of all men in his position.

I agree with the majority that the United States Supreme Court precedents it discusses have customarily emphasized the importance of an actual relationship of parental responsibility, as distinguished from a mere biological relationship, in cases involving constitutional protection for parental rights. See *Wisconsin v. Yoder*, 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972) (parents have protected liberty interest in controlling their children's religious upbringing); *Pierce v. Society of Sisters*, 268 U.S. 510, 69 L. Ed. 1070, 45 S. Ct. 571 (1925) (parents have protected liberty interest in the way they choose to educate their children); *Meyer v. Nebraska*, 262 U.S. 390, 67 L. Ed. 1042, 43 S. Ct. 625 (1923) (parents have protected liberty interest in controlling their children's education). And this unmistakable theme has continued in the series of cases particularly addressing the parental rights of unwed fathers. None of the decisions, so far limited to factual situations involving older children rather than newborns, has recognized a putative father's *absolute* right to notice and an opportunity to be heard in adoption proceedings.

However, if a known natural father has made sufficient efforts to become a responsible parent, thus giving rise to substantive due process rights or a liberty interest under the federal Constitution, the Kansas Adoption and Relinquishment Act generally requires

consent or relinquishment of his rights before an adoption can be finalized. This is the baseline. Specific statutory requirements must be met to move beyond it.

K.S.A. 59-2136(e) does not provide "several mechanisms within a man's control which, if exercised, entitle him to notice of adoption proceedings." The statute is directed at the grounds and procedures the court should employ to determine a natural father's identity. It is not directed at natural fathers whose identities mothers have concealed or never known. In this case, an inaccurate affidavit, produced and submitted under K.S.A. 59-2136(e), led to a false identification of A.A.T.'s putative father and the undisputed lack of actual notice to M.P. of the adoption proceeding. In short, N.T.'s deceitful manipulation of K.S.A. 59-2136(e) does nothing to demonstrate M.P.'s failure to diligently or promptly protect any parental rights that might have arisen and attached to him.

The majority further asserts that K.S.A. 59-2136(h) is not at issue in this appeal. To the extent this may be literally correct, it fails to recognize that the reason this statute is not in issue is the district court's error in ignoring it. This error is addressed further below. For the moment, it is sufficient to note that K.S.A. 59-2136(h) lists exceptions to the general rule requiring consent or relinquishment before a natural father's parental rights can be terminated. It reads:

"(h) When a father or alleged father appears and asserts parental rights, the court shall determine parentage, if necessary pursuant to the Kansas parentage act. If a father desires but is financially unable to employ an attorney, the court shall appoint an attorney for the father. Thereafter, the court may order that parental rights be terminated, upon a finding by clear and convincing evidence, of any of the following:

(1) The father abandoned or neglected the child after having knowledge of the child's birth;

(2) the father is unfit as a parent or incapable of giving consent;

(3) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;

(4) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;

(5) the father abandoned the mother after having knowledge of the pregnancy;

(6) the birth of the child was the result of rape of the mother; or

(7) the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition."

Kansas adoption statutes are strictly construed in favor of maintaining the rights of natural parents in controversies over termination of their rights. This is certainly true when a claim is made that a natural father has failed to fulfill his statutory obligations and thus that his consent to an adoption is unnecessary. *In re Adoption of Harrington*, 228 Kan. 636, 638, 620 P.2d 315 (1980); *In re Sharp*, 197 Kan. 502, 504, 419 P.2d 812 (1966). This approach is reflected in part by the statute's requirement that evidence supporting a court's choice to dispense with a father's consent be clear and convincing. See K.S.A. 59-2136(h)(1).

In *In re Adoption of Baby Boy B.*, 254 Kan. 454, 456, 866 P.2d 1029 (1994), this court affirmed a district court order denying a petition for adoption. The child's natural father, not married to the mother, had opposed the petition; and the adoptive parents argued his parental rights should be terminated because they believed he had failed without reasonable cause to provide support to the mother during the 6 months before the child's birth.

We stated that the legislature had limited the circumstances in which an adoption could be granted without the consent of the father to the seven listed in the statute and were concerned only with whether substantial competent evidence existed to support the district judge's findings and decision under that provision. *Baby Boy B.*, 254 Kan. at 460-61. On the limited issue of whether support had been provided to the mother in the 6 months before the child's birth, we considered the mother's refusal to accept assistance from the father relevant; we considered neither the father's fitness as a parent nor the best interests of the child relevant. 254 Kan. at 464-65.

In this court's earlier decision in *In re Adoption of F.A.R.*, 242 Kan. 231, 747 P.2d 145 (1987), Justice Holmes, writing for a five-member majority, made a similar observation regarding the influence of the best interests of the child standard when a natural father who had once been married to two young boys' mother was incarcerated and an allegation was made that he therefore failed

to assume the duties of fatherhood. The natural father refused to consent to the boys' adoption by a stepfather:

"It should also be noted that the best interests of the child, which is the paramount consideration in custody matters, is not controlling in determining the statutory issue of whether a natural parent has failed to assume parental duties. We have no doubt that the best interests of the children in this case weigh[] heavily in favor of the adoption. It is unfortunate that this father apparently has little concern for the children's welfare and, instead, has chosen to stand upon his legal rights, but under our statutory scheme of adoption he has that choice.

"We also note that the fitness of [the natural father] as a parent is not a controlling factor . . . as it would be in a proceeding to sever parental rights [in a child in need of care proceeding]. [Citations omitted.]" *In re Adoption of F.A.R.*, 242 Kan. at 235.

This court also recognized in *In re Adoption of F.A.R.* that the evidence supported the district judge's finding of maternal interference with the natural father's rights to maintain contact with his children. Although it expressed understanding of any reluctance to force the children to visit their natural father in prison, the court ultimately ruled that his rights could not be terminated and that the adoption could not go forward. It acknowledged that "individual members of the court might have reached a contrary result if sitting at the trial level." 242 Kan. at 237, 239-40.

Several cases from our Court of Appeals dealing with the parental rights claims of unwed natural fathers also should inform our understanding and application of Kansas law.

In *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d 644, 29 P.3d 466 (2001), *aff'd* 273 Kan. 71, 41 P.3d 287 (2002) (adopting Court of Appeals opinion), the panel examined a district court's ruling that an unwed father's efforts to support his child's mother during her pregnancy prevented termination of his rights and, thus, adoption. The panel stated that the instances set out in K.S.A. 59-2136(h)(1)-(7) were examples of "situations in which the relationship of a natural father is little more than biological." 29 Kan. App. 2d at 667.

The panel decided that substantial efforts by an unwed father to support his child's mother during her pregnancy and up to the child's birth were necessary; and it reversed the district court's decision as unsupported by substantial competent evidence. 29

Kan. App. 2d at 671. It saw "no evidence" that the father had provided support or that the mother had refused it, despite the district judge's observation that the mother had "blocked" the father "out of any opportunity to provide support." 29 Kan. App. 2d at 666, 671. "Support" under the statute, the panel said, did not require the father to provide total support for the mother; however, support that was incidental or inconsequential in nature would not be sufficient. Rather, it must be reasonable under all of the circumstances. 29 Kan. App. 2d at 667; see also *In re Adoption of D.M.M.*, 24 Kan. App. 2d 783, 788, 955 P.2d 618 (1997) (reasonable support efforts by father required).

In *In re Lathrop*, 2 Kan. App. 2d 90, 575 P.2d 894 (1978), which predated passage of K.S.A. 59-2136(h), an unmarried mother placed her child with adoptive parents 2 days after birth. The natural father was not originally notified of the filing of the adoption petition, nor was his consent to the adoption obtained. Although the record did not explain the circumstances, the father learned of the adoption proceeding, and he appeared and objected. He sought custody of the child, asserting that he had paid support to the mother and any medical expenses made known to him.

By the time the Court of Appeals panel decided the father's custody claim, the child had lived in an adoptive home for more than 18 months. The panel nevertheless held that the father had "parental rights to the custody of his child and . . . that those rights must be given preference and will prevail over those of the adoptive parents due to the parental preference rule." 2 Kan. App. 2d at 95. The panel did not fault the father for failure to fulfill parental responsibilities when outside agencies or adoptive parents had posed obstacles to his involvement. Due process required that "a putative father who appears and asserts his desire to care for his child has rights paramount to those of non-parents," unless proved otherwise unfit. 2 Kan. App. 2d at 96.

After enactment of the language now in K.S.A. 59-2136(h)(1)-(7), the Court of Appeals took up a due process challenge to its constitutionality in *In re Baby Boy N.*, 19 Kan. App. 2d 574, 874 P.2d 680, *rev. denied* 255 Kan. 1001 (1994). In that case, an unwed father argued that his parental rights could not be terminated ab-

sent a specific finding that he was unfit, and the Kansas Adoption and Relinquishment Act (Act), K.S.A. 59-2111 *et seq.*, improperly permitted termination in other circumstances. 19 Kan. App. 2d at 579. The Court of Appeals, relying on the *Stanley*, *Quilloin*, and *Caban* decisions, disagreed. *Stanley v. Illinois*, 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972); *Quilloin v. Walcott*, 434 U.S. 246, 54 L. Ed. 2d 511, 98 S. Ct. 549, *reh. denied* 435 U.S. 918 (1978); *Caban v. Mohammed*, 441 U.S. 380, 60 L. Ed. 2d 297, 99 S. Ct. 1760 (1979). It held that the degree of protection afforded parental rights under due process depended upon the extent and nature of the parent-child relationship. 19 Kan. App. 2d at 584-85; but see *In re Adoption of A.P.*, 26 Kan. App. 2d 210, 216, 982 P.2d 985, *rev. denied* 268 Kan. 886 (1999) (relying on apparently unwed father's unfitness).

Because of this limitation on the extent of the unwed father's substantive due process right, clear and convincing proof of any of the seven circumstances enumerated in the statute would permit a court to dispense with the father's consent constitutionally. *Baby Boy N.*, 19 Kan. App. 2d at 585. The panel held that the process provided under the Act was all that was due; it was sufficient to guarantee the father timely and meaningful notice and opportunity to be heard, as well as appointed counsel, if necessary. 19 Kan. App. 2d at 585. It is especially significant for our purposes here, however, that the panel stated: "[w]here a trial court finds that a father's reasonable efforts to provide for his child's welfare failed because of interference by the mother, adoption agency, or adoptive parents," then "the statute should not operate to terminate [the unwed father's] parental rights." 19 Kan. App. 2d at 585.

In *Baby Boy N.*, the Court of Appeals panel also reconciled the Act and Kansas' historical attachment to the parental preference doctrine: The doctrine is "nothing more than a rule of law designed to protect the constitutional due process rights of a natural parent to the custody of his or her children. The protections incorporated within K.S.A. 1993 Supp. 59-2136(h) provide the same, if not better, protection of a parent's constitutional rights." 19 Kan. App. 2d at 585-86. The panel observed that statutes such as K.S.A. 59-2136(h) had been construed to incorporate the doctrine through

their protection of due process rights and the "clear and convincing" standard of proof required for termination. 19 Kan. App. 2d at 585.

The following year, another Court of Appeals panel ruled in favor of an unwed father in *In re K.D.O.*, 20 Kan. App. 2d 559, 562, 889 P.2d 1158 (1995), excusing his failure to provide support to the mother of his child for reasonable cause.

In *K.D.O.*, the father had offered to give the mother money, to allow the mother the use of his car, to obtain items for the baby, and to drive the mother to the hospital for delivery. The father contacted the mother throughout the pregnancy, except for a period when the mother's telephone was disconnected. According to the father's testimony, at some point the mother refused to see him and rebuffed all offers of support. The mother admitted that the father had made offers of support. She said she "did not want to be bothered by his offers," admitting she " 'shut him out.' " 20 Kan. App. 2d at 561.

Under these circumstances, the panel cited *Baby Boy N.*, 19 Kan. App. 2d at 585, and held: "Where a trial court finds that a father's reasonable efforts to provide support for the mother during the six months prior to the child's birth have failed because of interference by the mother, an adoption agency, or the adoptive parents, K.S.A. 59-2136(h)(4) should not operate to terminate his parental rights." *In re K.D.O.*, 20 Kan. App. 2d at 562; see also *In re Adoption of Baby Boy B.*, 254 Kan. at 465 ("district court properly considered mother's refusal as factor in determining if father provided support").

A Court of Appeals panel again considered the issue of an unwed father's rights to due process before termination of parental rights in *In re Adoption of Baby Boy S.*, 22 Kan. App. 2d 119, 912 P.2d 761, *rev. denied* 260 Kan. 929, *cert. denied* 519 U.S. 870 (1996), and reached an opposite conclusion.

In that case, the father learned through an adoption agency that the mother intended to place his child for adoption. He called the agency to voice his opposition to the adoption, but he did not tell the agency he was willing to support the mother during the pregnancy. He did not "ask for [the mother's] address, nor did he ask

the agency to convey any message offering support. He did not contact [the mother's] family or any of her known friends to offer financial support or to express his opposition to the adoption." 22 Kan. App. 2d at 122. The child was placed with adoptive parents immediately after birth. The panel, citing *Baby Boy N.*, affirmed the district judge's K.S.A. 59-2136(h)(1)(D) termination of the father's parental rights for failing to support the mother without reasonable cause during the 6 months before the child's birth. *Baby Boy S.*, 22 Kan. App. 2d at 126-29.

In this case, adoptive parents directed our attention to two Idaho cases dealing with situations in which a mother was less than forthright about a father's role in a child's conception. *Petition of Steve B.D.*, 112 Idaho 22, 730 P.2d 942 (1986), and *Doe v. Roe*, 142 Idaho 202, 127 P.3d 105 (2005).

Among the cases from sister states cited by the majority, I regard the facts of *Doe v. Queen*, 347 S.C. 4, 552 S.E.2d 761 (2001), as the most similar to those before us here. In it, the South Carolina Supreme Court held that an unwed father's consent was required for an adoption. The mother in *Queen* had informed the father that she was pregnant and wanted an abortion; he tried to persuade her to carry the pregnancy to term. The two ended their relationship, and the mother falsely informed the father that she had followed through with an abortion. The mother and her new boyfriend then facilitated a criminal warrant against the father for assault with a deadly weapon; as a condition of bond, the natural father was ordered to have no contact with the mother for 1 year.

The father was notified of the birth of the child 2 months after it occurred. He obtained an attorney, began saving money, prepared a nursery, and arranged for medical insurance for the child. The South Carolina Supreme Court stated:

"Initially, we find [the father] should not be penalized for his actions, or lack thereof, prior to [the child's] birth. Mother left their apartment when she was approximately 8-10 weeks pregnant, telling [the father] she intended to have an abortion. She thereafter lied, telling him she had, in fact, had an abortion in Atlanta. She then made every attempt to conceal from [the father] the fact that she had not had an abortion, effectively isolating herself from him and, through court orders, ensuring that [the father] could have no contact with her until well after the baby's birth." 347 S.C. at 8-9.

Like the natural father in *Queen*, M.P.'s behavior in this case should not have disqualified him from receiving minimal procedural due process, *i.e.*, timely notice and an opportunity to be heard, on whether his substantive due process right or liberty interest in parenting A.A.T. should be terminated without his consent or relinquishment. Under the majority's formula, M.P. was diligent and prompt enough to be deserving of a day in court.

I note in this regard that the district judge concluded that M.P. did not abandon N.T. during her pregnancy. In contrast, N.T. actively concealed her continued pregnancy and A.A.T.'s birth and adoption, both nonverbally and verbally. She moved half a broad nation away from M.P. She did not give him her new address. She concocted the abortion story, as it happens, a little more than 5 months before A.A.T. was born, *i.e.*, near the beginning of the time period when M.P. might have solidified his claim to parent A.A.T. by providing financial and emotional support to N.T. under K.S.A. 59-2136(h)(4). When A.A.T. was born, N.T. came up with an additional story of the baby's death at delivery, knowing that otherwise M.P. could still learn the truth through a question posed to her mother. She authorized virtually immediate transfer of A.A.T.'s custody to the adoptive parents. She gave a false surname for M.P. and withheld information about his location when contributing to the affidavit required for the adoption proceeding. She lied about whether M.P. was willing to help her or the baby. For 6 months after A.A.T. was born, N.T. continued her charade. When M.P. became too insistent about his doubts, telephone contact between her and M.P. temporarily ceased.

As soon as N.T. told M.P. the truth about A.A.T., M.P. launched his effort to determine and assert his legal right to be a father. He found a lawyer in Wichita and filed this action. He has since persevered in prosecuting it, presumably at substantial financial, time, and energy expense. Adoptive parents have chosen to resist M.P.'s effort, and it was their prerogative to do so. I do not question their motives or their affection or concern for the newborn who has grown into a preschooler in their care. But, by the same token, I do not question M.P.'s motives or sincerity.

I simply cannot agree with the district judge or with the majority, who apparently would force M.P. to meet what I consider a nearly impossible standard, depriving him of his right to parent A.A.T. because he failed to uncover the nature, extent, and effect of N.T.'s lies at some earlier date. I see such a rule as inconsistent with the historical parental preference rule of Kansas common law and our legislature's carefully designed codification of its modern incarnation. I would hold, consistent with United States Supreme Court precedent on unwed fathers and the statutes and cases of this jurisdiction, that M.P.'s "inchoate interest" ripened into a constitutionally protected, substantive due process right not to be deprived of the companionship, care, custody, and management of his child. In the absence of his consent or relinquishment with appropriate notice he would have appeared and objected to A.A.T.'s adoption, and the process due him was that outlined by our legislature in K.S.A. 59-2136(h)(1)-(7). The district court judge should have heard evidence and made factual findings and drawn conclusions of law as to whether any of the seven scenarios set out in that statute applied at the time the termination of M.P.'s parental rights and the adoption were being considered.

Instead, the district judge in this case did not make extensive findings or draw complete conclusions as to each of the K.S.A. 59-2136(h)(1)-(7) scenarios. M.P. had argued that none of the seven applied. The adoptive parents had argued that M.P. did not attempt to provide financial support to A.A.T. or to set aside the adoption decree until the DNA test confirmed that he was A.A.T.'s father, allowing termination of M.P.'s rights under K.S.A. 59-2136(h)(1) or (3). They also argued that he failed without reasonable cause to provide support to N.T. during the last 6 months of her pregnancy under 59-2136(h)(4). I read the judge's limited findings and conclusions to stop well short of resolving these arguments. Because he believed that M.P. should have known earlier of N.T.'s deceit, he concluded that M.P.'s actions were insufficient to give him a substantive due process right to parent. Without that right, that full-blown liberty interest, there was nothing to protect with the procedural due process of 59-2136(h)(1)-(7); and the applicability of the seven scenarios did not have to be evaluated.

As fully discussed above, I would reach an opposite legal conclusion on the existence of M.P.'s liberty interest. Because of it, the district court was not free to dispense with actual notice to and consent or relinquishment by M.P., unless one of the scenarios in 59-2136(h)(1)-(7) was present at the time M.P.'s rights were terminated and the adoption finalized. I believe we are lacking factual findings that can only be made in the first instance by the district judge. I would therefore reverse and remand this case so that the district judge can arrive at more thorough findings of fact on the applicability or inapplicability of the seven scenarios as of August 24, 2004. If one of those scenarios existed and would have supported termination of M.P.'s parental rights despite his objection on that date, then either there was no harm from the violation of due process originally or any violation of it has been cured by the due process M.P. has received in this proceeding. In either event, the adoption decree would not need to be declared void under K.S.A. 60-260(b)(4). If, on the other hand, none of the seven scenarios existed on August 24, 2004, then the decree would need to be declared void, a nullity; and M.P. would be entitled to sole care, custody, control and management of A.A.T. Given the passage of time, this admittedly pragmatic solution is appropriate.

The possibility that a child of A.A.T.'s age will be removed from the only home A.A.T. has ever known is extremely distressing. It is hard for me to imagine a set of facts that would bring the human and legal tensions between the arguments advanced by the parties and among the interests and issues analyzed by courts into sharper relief than that set before the court here. A natural father was deliberately deceived about the continuation of a pregnancy to term, denying him the practical possibility of choosing to support the mother up to delivery or the child after birth. A mother engaged in an elaborate scheme to prevent the father from discovering that she did not have an abortion and that she placed the child for adoption without his knowledge, consent, or choice to relinquish his rights, again denying him the practical possibility of choosing to support the child. Significant time passed before the father's discovery of the mother's lies; and far more significant time, particularly when measured in child time, passed before the

case came before us for decision. In that later period, according to the record before us, the father and his counsel have diligently pursued development and protection of father's legal rights. The adoptive parents and their counsel, understandably, have exercised similar diligence to guard the finality of the adoption and the family to which it gave rise. I am fully aware of the psychological and legal merits of such finality. At this late date, however, it is clear that neither M.P. nor the adoptive parents are likely to volunteer to surrender their claim to exclusive companionship, care, custody, and management of A.A.T. so that the parameters of A.A.T.'s family can be adjusted and maximized to give all of the adults who want to be parents cooperative roles. Thus, in my view, this court is bound to deliver on the promise of the federal Constitution's guarantee of due process to M.P., as that concept has been defined by our legislature. So too is the district judge. Neither this court nor the district court is permitted to default to a merely comfortable result.

I must also add two final points before leaving discussion of this issue.

First, the legislature has revised K.S.A. 59-2136 since the original adoption hearing in this case to make the best interests of the child a factor for consideration on termination of parental rights. See K.S.A. 2007 Supp. 59-2136(h)(2)(A). This amendment cannot be applied to M.P's situation retroactively because of our rule that adoption statutes be construed in favor of maintaining his rights. Had M.P. received the timely notice and opportunity to be heard to which he was entitled, statutes and precedent existing at the time would have made the district judge's findings under K.S.A. 59-2136(h)(1)-(7) subject only to appellate review for substantial competent evidence to support them. See *In re Adoption of Baby Boy B.*, 254 Kan. 454, 462, 866 P.2d 1029 (1994); *In re Adoption of F.A.R.*, 242 Kan. 231, 235, 747 P.2d 145 (1987).

Second, I would not accept the adoptive parents' or the *amicus* American Academy of Adoption Attorneys' arguments that A.A.T. has a constitutional right in this situation that trumps M.P.'s liberty interest in parenting. The United States Supreme Court has not yet ruled upon the issue of a child's liberty interest in preserving

familial or "family-like" bonds. Although Justice Stevens has stated in dissent that, to the "extent parents and families have fundamental liberty interests in preserving such intimate relationships, so, too, do children have these interests," *Troxel v. Granville*, 530 U.S. 57, 88, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000) (Stevens, J., dissenting), his fellow justices have not yet weighed in on this question. See *Troxel*, 530 U.S. at 88-89 (question reserved for future case, citing *Michael H. v. Gerald D.*, 491 U.S. 110, 130, 105 L. Ed. 2d 91, 109 S. Ct. 2333 [1989]). There also is no Kansas authority on this point.

Finally, I also differ from the majority on the appropriate disposition of this case under M.P.'s second alternative argument. In my view, it appears the district judge effectively equated the due diligence standard under K.S.A. 60-260(b)(2) to the standard M.P. must meet to establish a substantive due process right or liberty interest in parenting. The judge rejected M.P.'s due process claim, despite the undisputed absence of actual notice to him of the adoption proceeding, because M.P. "should have taken action to protect his parental rights."

On the facts of this case, application of the two standards requires a similar, though not identical, calculus. The degree of effort M.P. was required to expend to grasp his opportunity to parent, to see that his inchoate interest ripened into a right accorded due process protection, is roughly equivalent to the degree of effort he had to expend for his diligence to be all that was due under 60-260(b)(2). However, the substantive due process inquiry looks at a broader time period—here, from M.P.'s knowledge of A.A.T.'s conception in October 2003 until today. The only period of time relevant to judgment of the adequacy of M.P.'s diligence under K.S.A. 60-260(b)(2) extended from January 22, 2004, the day N.T. lied to him about having undergone an abortion, until December 24 or 25, 2004, the day she confessed that she had given birth to A.A.T. and facilitated the baby's adoption. I also believe that the question under K.S.A. 60-260(b)(2) is narrower in scope than the constitutional question. It is concerned only with whether M.P. did all that could reasonably be expected of him in the more limited time frame to *discover* that he had fathered a child. His actions

after that point to *claim and enforce* his paternal right, although relevant to ripening of his inchoate interest, are not relevant to whether he should have discovered A.A.T.'s existence and thus his own paternity before the adoption was finalized in August 2004.

Although abuse of discretion is a less searching standard of appellate review than the de novo standard applied to the constitutional question, I think this court also should set aside the adoption decree on the basis of newly discovered evidence under K.S.A. 60-260(b)(2). The evidentiary value of the knowledge M.P. acquired on December 24 or 25, 2004, to a sound decision of the issues raised by the adoption was extremely high. Had he possessed that knowledge before the final decree issued, he could and would have interposed a timely objection to termination of his rights. The adoptive parents would have been put to their burden of proof under K.S.A. 59-2136(h)(1)-(7). Knowing as much as I can glean from the current state of the appellate record, and without further findings from the district judge, it appears the evidence of N.T.'s deceit and its results would have been likely to produce a different result.

My evaluation of the adequacy of M.P.'s diligence is heavily influenced by the egregious nature of N.T.'s behavior. She lied repeatedly and obviously intentionally; she enlisted numerous unwitting accomplices to put and maintain both physical distance and information inequality between herself and M.P.—including the guardian ad litem, the adoption agency, and, for a few months, the court system. N.T. kept M.P. in the dark long enough that the adoption could be finalized without M.P.'s knowledge or involvement and, perhaps worst of all, until the notion of separating A.A.T. from his or her adoptive parents would be painful to contemplate. Although it is possible M.P. could have done more to expose N.T.'s lies before December 24 or 25, 2004, the standard for K.S.A. 60-260(b)(2) due diligence is not that he move heaven and earth. Reasonably assertive behavior is sufficient. He had suspicions; and he persisted in voicing them to the one person in near total control of his access to the facts that would confirm or alleviate those suspicions. Eventually, N.T. cracked.

Were this case to be reversed on the sole ground of newly discovered evidence, this second alternative argument from M.P., I believe the course of action would be the same. For the reasons I outlined above, the case would have to be remanded to the district judge for full development of the facts supporting the parties' arguments under K.S.A. 59-2136(h)(1)-(7) and legal conclusions drawn from those facts.

ROSEN, J., dissenting: I join with Justice Beier's dissent and rationale to remand to the district court for further factual findings and legal conclusions under K.S.A. 59-2136(h). I write separately, however, to express my disagreement with and concern over the apparent lack of consideration of the best interests of the child, A.A.T. While the majority and the other dissents are concerned with protecting the rights and interests of the adoptive parents and natural father, they do not provide for meaningful consideration of the best interests of the child, which I consider the principal issue in this matter. Promoting the best interests of children permeates both statutory and case law. The best interests of a child are the implicit goal of any custody determination and should be considered here, even though K.S.A. 59-2136 did not expressly require the district court to do so.

When this court makes the statutory rights of the adoptive parents and the due process rights of the natural father dispositive, it dehumanizes A.A.T., treating him as if he were a piece of chattel property with no rights and interests of his own. This court has long held, however, that "a child is not in any sense like a horse or any other chattel." *Chapsky v. Wood*, 26 Kan. 650, 652 (1881). "[A] parent's right to the custody of a child is not like the right of property, an absolute and uncontrollable right." 26 Kan. at 652-53.

The United States Supreme Court has held that, unlike chattel, children have independent rights under the Constitution. "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 74, 49 L. Ed. 2d 788, 96 S. Ct. 2831 (1976). We recently

recognized this status by holding that juveniles charged with crimes have the same right to a jury trial as adults under the United States and Kansas Constitutions. See *In re L.M.*, 286 Kan. 460, Syl. ¶¶ 1, 2, 186 P.3d 164 (2008).

The United States Supreme Court has recognized the need for considering the best interests of the child in a variety of contexts. See *Hodgson v. Minnesota*, 497 U.S. 417, 483, 111 L. Ed. 2d 344, 110 S. Ct. 2926 (1990) ("Limitations have emerged on the prerogatives of parents to act contrary to the best interests of the child with respect to matters such as compulsory schooling and child labor."); *Palmore v. Sidoti*, 466 U.S. 429, 433, 80 L. Ed. 2d 421, 104 S. Ct. 1879 (1984) ("goal of granting custody based on the best interests of the child is indisputably a substantial governmental interest for purposes of the Equal Protection Clause"); *Bellotti v. Baird*, 443 U.S. 622, 643-44, 61 L. Ed. 2d 797, 99 S. Ct. 3035 (1979) (minor may obtain judicial consent for medical procedure if the minor shows the desired procedure is in the minor's best interests).

Not only has the United States Supreme Court emphasized that courts must safeguard the rights of children, this court as well has consistently encouraged weighing the best interests of children in determining custody, stepparent adoption, and paternity. Even where not explicitly required by statute, we have considered the best interests of the child in custody cases.

For example, in *In re Adoption of B.G.J.*, 281 Kan. 552, 558, 133 P.3d 1 (2006), the best interests of the child and bonding between the child and the adoptive parents were considered in addition to custody-determining factors explicitly delineated by the Indian Child Welfare Act. Although the Prairie Band Potawatomi Nation expressed its intent to seek custody of B.G.J., the adoption agency placed B.G.J. with her adoptive parents less than 3 weeks after birth. Federal guidelines established a preference for adoptive placement of an Indian child with members of the Indian child's tribe over nonmembers but allowed for factors which would create good cause to disregard the preference order. Although the guidelines in question did not expressly list the best interests of the child as a consideration, we found the list of factors was not ex-

haustive and the best interests of the child could be taken into account. 281 Kan. at 565. "The best interest of the child remains the paramount consideration, with [the Indian Child Welfare Act] preferences an important part of that consideration." 281 Kan. at 565.

Likewise, the best interests of A.A.T. deserve consideration here despite the fact that the statute in effect at the time did not expressly instruct the district court to do so.

In numerous other situations, Kansas statutes and supporting case law have consistently included the best interests of the child. See K.S.A. 38-1114(c); *Reese v. Muret*, 283 Kan. 1, 6-10, 150 P.3d 309 (2007) (determining presumption of paternity; district court must conduct hearing prior to issuing order for genetic testing to determine whether such testing is in best interests of child, even when "child" has attained age of majority); *In re Adoption of B.M.W.*, 268 Kan. 871, 881-82, 2 P.3d 159 (2000) (granting or denying stepparent's adoption application; best interests of child not controlling factor but may be considered); *Parish v. Parish*, 220 Kan. 131, 132, 551 P.2d 792 (1976) (determining custody between two fit biological parents; "In determining the right of custody of children between parents, the primary consideration is the best interest and welfare of the children, and all other issues are subordinate thereto."); *In re D.C.*, 32 Kan. App. 2d 962, 966, 92 P.3d 1138 (2004) (permanent placement determinations after termination of parental rights; "[A] reasonable permanent placement decision necessarily implies a decision that is in the best interests of the child under the circumstances. . . . [T]he court must consider all of the facts and circumstances in light of the child's physical, mental, and emotional needs."); see also K.S.A. 2007 Supp. 59-2136(d) (best interests of child stepparent adoption). Further, the Supreme Court has observed that state law, which generally governs custody and adoption, has a "general overarching concern for serving the best interests of children." *Lehr v. Robertson*, 463 U.S. 248, 257, 77 L. Ed. 2d 614, 103 S. Ct. 1985 (1983).

While the weight of case law supports promotion of the best interests of the child, and while A.A.T. has an interest in protecting his familial bonds, Justice Beier's dissent is correct in its statement

that the statute in effect at the time of the original adoption hearing did not explicitly require weighing A.A.T.'s best interests. The Kansas Legislature has since recognized the need for consideration of the best interests of a child in cases such as this. When the natural father began to contest this adoption, the version of the statute in effect at the time listed seven factors to be considered. K.S.A. 59-2136(h). In 2007, the Kansas Legislature amended the statute in order to explicitly allow the court to "consider and weigh the best interest of the child" in addition to hearing evidence regarding the seven factors. K.S.A. 2007 Supp. 59-2136(h)(2). I do not agree, however, that this amendment implies it is unnecessary to examine the best interests of the child when deciding whether to overturn an adoption in instances prior to the legislative amendment.

Although both the majority and Justice Beier's dissenting opinion touch on the topic of the best interests of A.A.T., the other dissents do not allow for such consideration, while the majority seems to conclude—without the benefit of fact-finding by the district court—that continuing the adoptive relationship is inherently in A.A.T.'s best interests. The adoptive parents and the natural father focus on protecting their own rights and interests rather than the best interests of A.A.T.—the person who arguably will be most intimately and personally affected by the outcome of this case.

A.A.T. has lived his life in the custody and care of his adoptive parents, who took him home from the hospital after his birth. He is now 4 years old, old enough that removal from the only home he has known would likely be a traumatic event. Psychiatric and other mental health research and evidence has demonstrated that removing a child from the only parents the child has ever known, even if the removal is from adoptive parents to the custody of a natural parent, can be traumatic, painful, and permanently damaging to the child. See Comment, *The Emerging Rights of Adoptive Parents: Substance or Specter?*, 38 UCLA L. Rev. 917, 978 (1991).

When constitutional interests are being considered, "the Court has emphasized the paramount interest in the welfare of children and has noted that the rights of the parents are a counterpart of the responsibilities they have assumed." *Lehr*, 463 U.S. at 257. Courts have recognized that the term "family," while traditionally

applying to more formal structures, may be applied to nontraditional family units as well. "[B]iological relationships are not the exclusive determination of the existence of the family." *Smith v. Organization of Foster Families*, 431 U.S. 816, 843, 53 L. Ed. 2d 14, 97 S. Ct. 2094 (1977). While the cases discussed above deal with recognizing the parental liberty interest, they nevertheless show "the Court has found that the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection." *Lehr*, 463 U.S. at 258.

Well over a century ago, this court recognized the importance of considering the child's well-being when adoptive parents and the natural father both seek custody: "[Once] the child has been left for years in the care and custody of others, who have discharged all the obligations of support and care which naturally rest upon the parent, then, whether the courts will enforce the father's right to the custody of the child, will depend mainly on the question whether such custody will promote the welfare and interest of such child." *Chapsky*, 26 Kan. at 653. Both the majority and the other dissents reject that wisdom in the case now before us.

The majority glosses over A.A.T.'s best interests, and the other dissenting opinions do not take into account the preservation of A.A.T.'s interest in a familial relationship with his adoptive parents. All decline to accept arguments that A.A.T. has a constitutionally protected interest. I do not believe that his best interests are necessarily synonymous with those of either the adoptive parents or the natural father, and I certainly do not agree that those interests should be weighed and determined by this court. See *McKissick v. Frye*, 255 Kan. 566, Syl. ¶ 8, 876 P.2d 1371 (1994) (appellate courts not to weigh evidence or evaluate credibility of witnesses); *In re J.D.D.*, 21 Kan. App. 2d 871, 875-76, 908 P.2d 633 (1995) (in termination cases, appellate courts will not search record and weigh evidence). Rather, I concur with Justice Beier's dissent in remanding this case for further factual findings and conclusions of law. I part from her dissent in that I believe the best interests of the child should be considered and given weight by the district court when determining whether to set aside the adoption even though such

consideration is not explicitly set forth in the statute in effect at the time of the adoption proceeding.